**F I L E D**

PUBLISH

**March 28, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CLYDE APPERSON,

      Defendant-Appellant.

No. 03-3368

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

WILLIAM LEONARD PICKARD,

      Defendant-Appellant.

No. 03-3369

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 00-CR-40104-01/02-RDR)**

---

Mark L. Bennett, Jr., Bennett and Hendrix L.L.P., Topeka, Kansas, for defendant-appellant, Clyde Apperson.

William K. Rork, Rork Law Office, Topeka, Kansas, for defendant-appellant, William Leonard Pickard.

Gregory G. Hough, Assistant United States Attorney (Eric F. Melgren, United States Attorney, and James A. Brown, Assistant United States Attorney, with him on the briefs), District of Kansas, for plaintiff-appellee.

Before **BRISCOE**, **ANDERSON**, and **MURPHY**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendants Clyde Apperson and William Pickard were convicted, following a jury trial, of conspiring to manufacture, distribute and dispense ten grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and possession with intent to distribute and dispense ten grams or more of a mixture or substance containing a detectable amount of LSD, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Apperson was sentenced to 360 months' imprisonment. Pickard was sentenced to life imprisonment. Both defendants now appeal their convictions and sentences. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

*Factual background*

In October 2000, Gordon Todd Skinner voluntarily contacted the United States Drug Enforcement Agency (DEA) and informed them he "wished to cooperate" and provide them with "information about an LSD organization." ROA, Vol. 13 at 84. Generally speaking, Skinner told the DEA "that William Leonard Pickard and Clyde Apperson were . . . partners" in an organization that manufactured LSD and that he, Skinner, "had been part of the organization . . . and was [at that time] in possession of the

laboratory equipment," ROA, Vol. 5, Doc. 360 at 3, "at a decommissioned missile base near Wamego, Kansas that he owned." Id. at 4.

Skinner proceeded to provide the DEA with more detailed information about the organization and his involvement. According to Skinner, Pickard and Apperson first established an LSD laboratory in an Aspen, Colorado residence in late 1996. Pickard, who had studied chemistry at Purdue University, served as the chemist. Apperson was responsible for setting up and dismantling the necessary laboratory equipment.

In September 1997, Pickard and Apperson moved the LSD laboratory from Aspen to a house in Santa Fe, New Mexico. Apperson assembled the laboratory at that location and Pickard proceeded to manufacture LSD there until approximately September 1999. During that time frame, Pickard obtained many of the chemicals and most of the necessary glassware from Alfred Savinelli, the owner of a business in Taos, New Mexico called "Native Scents." Pickard paid Savinelli over $300,000 from 1995 to 1999 for his help in obtaining the chemicals and glassware.

Skinner became involved with Apperson and Pickard in February 1998. Skinner assisted Pickard in laundering the cash proceeds of the conspiracy, and also played a major role in developing the covert communications scheme utilized by the conspirators. As Pickard's "money man," Skinner assisted Pickard "in the transport of money from the primary distributor to the persons whom . . . Pickard intended it to go, those being the [precursor chemical] source and other persons within the organization." ROA, Vol. 14 at 214.

In mid to late 1999, Pickard asked Skinner "to secure a location to house the clandestine [LSD] laboratory." Id. Initially, Pickard wanted the location to be elsewhere in Santa Fe, New Mexico. Pickard subsequently directed Skinner "to find a location either in Nevada or Kansas." Id. In September 1999, Apperson and Pickard dismantled the Santa Fe LSD laboratory and, in December 1999, moved it to an abandoned missile base near Salina, Kansas, where it was maintained by Skinner. In the fall of 2000, Skinner, apprehensive that the owners of the base were going to discover the laboratory, unilaterally decided to move it, along with a precursor chemical, to the Wamego missile base. In turn, Skinner was supposed to turn over possession of the laboratory and the precursor chemical to Apperson and Pickard.

After corroborating much of the information provided by Skinner, the DEA initiated an undercover operation with Skinner on October 19, 2000. At the outset of this undercover operation, the DEA recorded various phone calls between Skinner and Pickard. On October 23, 2000, at the DEA's request, Skinner met Pickard in a hotel room in Marin County, California. During the meeting, which was videotaped by the DEA, Pickard and Skinner discussed the LSD laboratory and the idea of moving it from its Wamego location. Pickard advised Skinner that he wanted Apperson to take possession of the laboratory equipment.

On October 27, 2000, Skinner gave DEA agents a tour of the Wamego missile base. During the tour, DEA agents observed "the contents of a non-operational LSD laboratory packed in approximately [forty-five] large, green shipping containers." ROA,

Vol. 5, Doc. 360 at 4. The DEA agents subsequently obtained and executed a search warrant for the base. Among the items seized during the search were 6.5 kilograms of a substance determined to be ergocristine, a substance used in the manufacture of LSD.

Following the search, DEA agents continued to monitor phone conversations between Skinner and Pickard. Pickard eventually told Skinner that he was coming to see the Wamego laboratory and to make sure that the ergocristine was secure. On November 2, 2000, Pickard and Apperson flew to Tulsa, Oklahoma. On November 4, 2000, Pickard and Apperson drove to Wamego in a rental car and met Skinner near the missile base.

During the meeting on November 4, 2000, Pickard and Apperson expressed to Skinner their concern about storing the laboratory equipment at the Wamego missile base. Pickard and Apperson also expressed concern about their own safety if the laboratory equipment and ergocristine were not returned to them. Ultimately, Pickard and Apperson began making plans to move the laboratory equipment and ergocristine out of the Wamego missile base.

That same day (November 4, 2000), Pickard and Apperson rented a truck in Topeka, Kansas, and listed a return destination for the truck as Albuquerque, New Mexico. The pair then drove the truck to the Wamego missile base and began loading it with lab equipment. On November 6, 2000, the ergocristine was returned by the DEA to the base, unbeknownst to Pickard and Apperson. That same day, Skinner informed Pickard and Apperson where the ergocristine was located on the base. Pickard retrieved the ergocristine and left the base with it in the rental car. Apperson also left the base

driving the rental truck loaded with lab equipment.

As Pickard and Apperson left the base, Kansas Highway Patrol (KHP) officers, acting at the request of the DEA, attempted to stop the rental car and truck. Pickard and Apperson, however, refused to stop and instead increased their speed. Eventually, the KHP officers forced Pickard and Apperson to stop by pulling in front of the rental truck driven by Apperson. Apperson was removed from the truck and taken into custody. Pickard fled from the scene on foot after letting the rental car roll to a stop in a ditch. Pickard was arrested the following day. The ergocristine was found in the rental car that Pickard had been driving. Also found in the rental car was a recipe for the manufacture of LSD and notes regarding what appeared to be past production quantities.

The DEA obtained search warrants for the missile base, which they executed on November 17 and 22, 2000. The execution of the warrants took several days due to the volume of materials and the danger posed by the chemical substances. During the searches, the DEA found numerous items and equipment associated with an LSD laboratory, as well as various chemical substances including 41.3 kilograms of LSD, 97.5 kilograms of lysergic acid, and 23.6 kilograms of iso-lysergic acid. The DEA also tested a large patch of dead grass found outside one of the buildings on the base. The soil samples tested positive for LSD, iso-LSD, and lysergic acid.[1]

---

[1] At trial, Pickard admitted that, while Apperson loaded equipment into the rental truck, he dumped hazardous solutions onto the ground where the soil samples were taken from.

*Procedural background*

On November 8, 2000, Pickard and Apperson were indicted on one count of conspiring "to manufacture, distribute and dispense 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD), a Schedule I controlled substance, in violation of" 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. ROA, Vol. 1, Doc. 1 at 1-2. Two superseding indictments were subsequently returned: the first on January 17, 2001, and the second on June 20, 2001. The first superseding indictment retained the original conspiracy count and added a second count alleging that on November 6, 2000, Pickard and Apperson knowingly possessed with intent to distribute and dispense ten grams or more of a mixture or substance containing a detectable amount of LSD, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Id., Doc. 59. The second superseding indictment expanded the time period of the alleged conspiracy to August 1999 through November 6, 2000, and added an alias for each defendant. Id., Doc. 88.

Following periods of delay attributable to pending pretrial motions and to health problems experienced by Pickard's counsel, the case proceeded to trial on January 13, 2003. On March 31, 2003, after eleven weeks of trial, the jury found Pickard and Apperson guilty as charged in the second superseding indictment. The district court subsequently held sentencing hearings on November 20, 24, and 25, 2003. At the conclusion of those hearings, the district court sentenced Apperson to concurrent terms of 360 months of imprisonment, and Pickard to concurrent terms of life imprisonment.

## II.

### *Speedy Trial violation*

Apperson and Pickard contend the district court erred in denying their motions to dismiss for violation of the Speedy Trial Act (STA). We "review the district court's denial of a motion to dismiss for violation of the [STA] for an abuse of discretion, and review the district court's compliance with the legal requirements of the Act de novo." United States v. Vogl, 374 F.3d 976, 982 (10th Cir. 2004). In doing so, we "accept the district court's [underlying] factual findings . . . unless they are clearly erroneous." Id. "'[W]hen the statutory factors are properly considered, and supporting factual findings are not clearly in error, the district court's judgment of how opposing considerations balance should not lightly be disturbed.'" Id. (quoting United States v. Taylor, 487 U.S. 327, 337 (1988)).

The STA, designed to protect a criminal defendant's constitutional right to a speedy trial and to serve the public interest in bringing prompt criminal proceedings, requires that a criminal defendant's trial commence within seventy days after his indictment or initial appearance, whichever is later. See 18 U.S.C. § 3161(C)(1); United States v. Lugo, 170 F.3d 996, 1000-01 (10th Cir. 1999). Certain periods of delay, outlined in detail in the STA, are excluded and do not count toward the seventy-day limit. See 18 U.S.C. § 3161(h)(1)-(9).

Both defendants, shortly prior to trial, moved to dismiss the case on STA grounds. The district court denied both motions. In doing so, the district court concluded that "the

speedy trial clock began running on November 8, 2000, the date of the indictment and the

defendants' first appearance before a judicial officer." ROA, Vol. 4, Doc. 245 at 1. The

court noted, however, that the "date of the indictment" was not included in calculating the

seventy-day period under the STA. Id. at 2 Continuing, the court noted that the period of

time between November 9, 2000, and the trial date of January 13, 2003, "consist[ed] of

796 days." Id. "Accordingly," the court concluded, "in order to avoid a Speedy Trial Act

violation, there must [have] be[en] 726 days of excludable time." Id. After examining

the docket, the district court concluded it had "easily discovered in excess of 726 days."

Id. Specifically, the district court listed what it considered to be the excludable time

periods:

> The following time periods are excludable because pretrial motions were
> pending: November 16, 2000 to November 20, 2000 (5 days), December 7,
> 2000 to January 29, 2001 (54 days), March 12, 2001 to February 4, 2002
> (329 days); February 13, 2002 to June 20, 2002 (128 days); and June 26,
> 2002 to July 21, 2002 (26 days). 18 U.S.C. § 3161(h)(1)(F). The period
> from January 11, 2001 to February 9, 2001 (11 additional days) is
> excludable because defendant Apperson's motion for severance was under
> advisement by the court. 18 U.S.C. § 3161(h)(1)(J). The time period from
> July 22, 2002 to January 13, 2003 (174 days) is excludable since the trial of
> the case was continued upon the motion of defendant Pickard, and the court
> found that the ends of justice served by the continuance outweighed the best
> interest of the public and the defendants in a speedy trial. 18 U.S.C. §
> 3161(h)(8)(A). Thus, the court has found at least 727 days of excludable
> time. In reaching this figure, we note that there may be other periods of
> excludable time, but we find it unnecessary to continue our study since we
> find no Speedy Trial Act violation.

Id. at 2-3.

In their respective appeals, Apperson and Pickard contend the district court's

calculations were erroneous in several respects and that the district court ultimately erred in concluding there was no violation of the STA. As outlined in more detail below, our calculations differ slightly from those of the district court, but we agree with the district court that the includable days did not exceed the seventy-day limit and thus there was no violation of the STA.

*a) November 8 - December 7, 2000*

Pickard contends that the time period from "November 8, 2000, until December 7, 2000 (28 days) is attributable to the government." Pickard Br. at 24. What Pickard overlooks, however, is that the period from November 16, 2000, through November 20, 2000 (five days) was excludable due to the pendency of the government's motion for de novo review of the magistrate judge's decision regarding Apperson's bond. See 18 U.S.C. § 3161(h)(1)(F) (providing that the "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excludable). Thus, only twenty-three days are attributable to the government during the period from November 8, 2000, until December 7, 2000.

*b) December 20, 2000 - January 10, 2001*

Apperson contends that there were twenty days of includable time between December 20, 2000, and January 10, 2001. More specifically, Apperson notes that he and Pickard filed various pretrial motions between November 20 and December 7, 2000, and the district court initially scheduled a hearing on those motions for December 20, 2000. The government, however, requested that the court continue the hearing for one week so

that the government could adequately prepare to defend the motions. The district court granted the government's request and rescheduled the hearing for January 10, 2001. In doing so, the district court's order expressly stated that "the additional time requested w[ould] not prejudice the parties" and that such time "outweigh[ed] the best interests of the public and the defendant[s] in a speedy trial, as set out in 18 U.S.C. § 3161(h)(8)." ROA, Doc. 54 at 2. Although Apperson and Pickard originally acquiesced in the government's request, Apperson now contends that the time during which the hearing was continued should not be excludable because it does not fall within the "ends of justice" category outlined in § 3161(h)(8)(A).[2]

We conclude there are two reasons why it is unnecessary to determine whether the "ends of justice" were indeed served by the granting of the hearing continuance. First, § 3161(h)(1)(F) makes excludable the "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of such motion . . . ." This necessarily includes any extensions of time to respond to a motion, as well as any postponements of hearing dates, without regard to the reasonableness of the length of time. See Henderson v. United States, 476 U.S. 321, 330

_____

[2] Pickard contends that "[a] total of twelve days from December 27, 2000 through January 9, 2001, should be assessed the Government." Pickard Br. at 24. We disagree. To begin with, the source of the December 27, 2000 date is unclear because the district court docket sheet indicates that no activity occurred on that date. In any event, Pickard overlooks the fact that on December 14, 2000, the district court granted the government's motion for extension of time and rescheduled a hearing on defendants' pretrial motions for January 10, 2001. ROA, Vol. 1, Doc. 54. And, for the reasons discussed above, we conclude the period encompassing the extension of time are excludable under the STA.

(1986); United States v. Matsushita, 794 F.2d 46, 51 (2d Cir. 1986). In other words, the twenty-one day continuance of the hearing granted by the district court is effectively encompassed within § 3161(h)(1)(F), and does not have to be independently justified under § 3161(h)(8)(A). Second, even if the continuance had not been granted and the hearing had taken place on December 20, 2000, as originally scheduled, it is clear from the record that the district court would still have required additional hearings to adequately resolve Apperson's motion to sever, and those hearings presumably would not have occurred any earlier than they actually did. Thus, under § 3161(h)(1)(F), the entire time period from December 12, 2000, when Apperson filed his motion to sever, until the district court took the defendants' various pretrial motions, including the motion to sever, under advisement, is excludable under the STA. Accordingly, the applicability of § 3161(h)(8)(A) to the twenty-day continuance of the motions hearing is irrelevant.

Even assuming, for purposes of argument, that § 3161(h)(8)(A) were relevant to the continuance of the hearing originally scheduled for December 20, 2000, the district court satisfied the requirements of that subsection. Subsection 3161(h)(8)(A) excludes any period of delay "resulting from a continuance granted by any judge . . . if the judge granted such continuance on the basis of its findings that the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). In order for a continuance to qualify as an excludable "ends-of-justice" continuance under § 3161(h)(8)(A), certain prerequisites must be met. First, the trial court must consider the factors listed in § 3161(h)(8)(B):

(i)  Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii)  Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act].

(iii)  Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv)  Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

After considering these factors, the trial court must then set forth, "in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such a continuance outweigh the best interests of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(8)(A).  Although the trial court's findings "may be entered on the record after the fact, they may not be made after the fact."  United States v. Doran, 882 F.2d 1511, 1516 (10th Cir. 1990).  Instead, "[t]he balancing must occur contemporaneously with the granting of the continuance because Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive . . . ."  Id.

Here, the district court's order granting the continuance of the hearing specifically stated that, "due to the press of other matters it [wa]s impossible for government counsel to prepare to represent the government" at the originally scheduled hearing, and that a "refusal to grant [the] request for continuance . . . would result in a miscarriage of justice." ROA, Doc. 54 at 1-2. The order further stated "[t]hat the additional time requested w[ould] not prejudice the parties" and that "[s]uch additional time outweigh[ed] the best interests of the public and the defendant[s] in a speedy trial . . . ." Id. at 2. In short, the district court considered the proper factors at the time it granted the continuance. See Doran, 882 F.2d at 1516. Thus, the district court did not abuse its discretion in granting the continuance. See United States v. Gonzales, 137 F.3d 1431, 1433 (10th Cir. 1998) (outlining standard of review in cases involving ends-of-justice continuances).

*c) January 10-29, 2001*

Pickard contends that the period of time from January 10, 2001, when the district court held a hearing on Apperson's motion to sever, until January 29, 2001, when the district court issued a written order memorializing its rulings from the hearing and noting that it was taking the motion to sever under advisement pending a James hearing[3], should be includable time under the Act (and that the thirty days following the district court's January 29, 2001, order should be excludable). Pickard's arguments, however, are not supported by the STA or the applicable case law. Indeed, the district court specifically concluded it could not resolve the motion without benefit of a James hearing, and the

_____

[3] See United States v. James, 590 F.2d 575, 582 (5th Cir. 1979).

-14-

record on appeal amply supports that conclusion. Under the STA, motions necessitating hearings are governed by 18 U.S.C. § 3161(h)(1)(F). That subsection provides that the "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excludable under the STA. 18 U.S.C. § 3161(h)(1)(F). Applying that subsection here, the entire period from the filing of Apperson's motion to sever, through the final evidentiary hearing on October 31, 2001, and at least thirty days thereafter, is excludable for purposes of the STA. See United States v. Jernigan, 341 F.3d 1273, 1286 (11th Cir. 2003) (holding that speedy trial clock was tolled from filing of defendant's motion in limine until trial, when district court was able to hear evidence necessary to rule on motion); United States v. Grosz, 76 F.3d 1318 (5th Cir. 1996) (holding that speedy trial clock was tolled from time of filing of defendant's motion in limine until second pretrial conference when district court heard oral argument on motion and ruled on it).

*d) January 11 - February 9, 2001*

Pickard contends the time period from January 11, 2001, to February 9, 2001, should not be excludable due to the pendency of Apperson's motion to sever "because the motion was not actually under advisement during this time." Pickard Br. at 25. Apperson similarly argues that most of the time during calendar year 2001 was includable and was not impacted by the pendency of his motion to sever. The record, however, refutes these contentions. According to the record, the district court heard initial arguments on the motion to sever on January 10, 2001, but concluded it needed to hear additional evidence

(specifically evidence from the <u>James</u> hearing) before ruling on the motion to sever. The evidentiary hearings relevant to the motion to sever took place on September 17-18 and October 31, 2001, after which the district court officially took the motion to sever under advisement. Thus, the motion to sever rendered excludable under the STA the time period from the filing of the motion until thirty days after the district court took the matter under advisement.

*e) January 17, 2001 - return of superseding indictment*

Apperson contends that the filing of the superseding indictment on January 17, 2001, did not "toll the speedy trial clock." Apperson Br. at 23. Although Apperson is correct that the filing of a superseding indictment does not serve to toll the speedy trial clock, he overlooks the fact that, due to the pendency of his motion to sever, the speedy trial clock was tolled at the time the superseding indictment was returned. <u>See</u> <u>United States v. Bermea</u>, 30 F.3d 1539, 1567 (5th Cir. 1994) ("The filing of a superseding indictment does not affect the speedy trial clock for offenses charged in the original indictment . . . .") ("However, motions pending on the charges in the previous indictment continue to toll the clock after the superseding indictment is returned if some of the original charges are retained.").

*f) December 1, 2001 - February 13, 2002*

Pickard contends that the district court had thirty days following the final evidentiary hearing on defendants' pretrial motions (held on October 31, 2001), in which to resolve those motions. Because the district court, however, did not resolve all of those

motions until February 2002, Pickard contends that the time period from December 1, 2001, until February 13, 2002 (the day before defendants filed additional pretrial motions), totaling seventy-five days, is includable for purposes of the STA.

Two subsections of the STA, §§ 3161(h)(1)(F) and 3161(h)(1)(J), are relevant to this time frame. Subsection (h)(1)(F) "excludes all time, regardless of reasonableness, between the filing of the pretrial motion and the hearing thereon, as well as all time following the hearing during which the court awaits the filing of additional materials by the parties that are needed for proper disposition of the motion." United States v. Mora, 135 F.3d 1351, 1355 (10th Cir. 1998). "Once all such materials are available to the court, subsection (h)(1)(J) comes into play, which provides for a thirty-day excludable delay during which the matter is under advisement." Id. In applying subsection (h)(1)(J), the thirty days of excludable time begins on the day following the date on which the court has received everything it needs in order to reach a decision. Id.

Applying the relevant provisions, the record on appeal indicates that Apperson filed his motion to sever on December 12, 2000. Although the district court heard initial arguments on that motion on January 10, 2001, the district court concluded it needed to hear additional evidence (specifically evidence from a James hearing) before ruling on the motion. ROA, Vol. 1, Doc. 63 at 8-9. On March 12, 2001, defendant Pickard filed three motions to suppress, as well as a motion for discovery, inspection and disclosure. The district court ultimately held evidentiary hearings on various matters, including the motion to sever and the motions to suppress on September 17-18 and October 31, 2001. At the

conclusion of the October 31, 2001 hearing, the district court stated it was "going to take these various motions under advisement" and "wrap all of these things up in one order that we will issue . . . as soon as we can." ROA, Vol. 15 at 571-72. Notably, however, the government asked for, and was granted, one week in which to respond to Pickard's supplemental memorandum regarding his motions to suppress. Id. at 569-70. On November 5, 2001, the government filed its response to Pickard's supplemental memorandum. Nearly a month later, on December 3, 2001, Pickard filed a reply to the government's response. On February 4, 2002, the district court issued written orders addressing all of the pending motions, except for Apperson's motion to sever. On February 19, 2002, the district court issued a written order denying Apperson's motion to sever.

It is beyond dispute that all of the time from December 12, 2000, through at least November 5, 2001, was excludable. More specifically, under subsection (h)(1)(F), the filing of Apperson's motion to sever on December 12, 2000, tolled the running of the clock (the filing of Pickard's motions to suppress on March 12, 2001, also tolled the clock), and the clock remained tolled until November 5, 2001, when the government filed its supplemental brief addressing Pickard's motions to suppress. See Henderson, 476 U.S. at 331 (interpreting subsections (f) and (j) of the Act to exclude the time following a hearing on a motion when the district court is awaiting additional briefing regarding the motion at issue); Mora, 135 F.3d at 1355.

The critical question here is when the district court actually took the various

-18-

motions under advisement. As noted, the district court expressly stated on the record at the conclusion of the October 31, 2001 hearing that it was taking the motions under advisement, subject only to its ruling allowing the government a short period of time in which to respond to Pickard's supplemental briefing on his motions to suppress. However, on December 3, 2001, Pickard filed a reply to the government's November 5, 2001 response. Although there is no indication in the record that Pickard sought leave to file that pleading, or that the district court was otherwise awaiting it before ruling on the pending motions, we conclude that Pickard's reply contained arguments and authorities that had to be considered by the district court in resolving the pending motions, and thus the pending motions cannot be considered to have been "under advisement" until after Pickard's reply was filed. Any conclusion to the contrary would effectively penalize the government and the district court by allowing a defendant to file an unanticipated pleading that effectively delays the resolution of pending motions without simultaneously tolling the STA clock.

As previously noted, under subsection (h)(1)(J), the district court had thirty days of excludable time in which to resolve the motions after taking them under advisement. Thus, because the motions were not "under advisement" until December 3, 2001 (when Pickard filed his reply brief), the thirty-day period from December 4, 2001, through January 3, 2002, was excludable, leaving only the forty-one-day period from January 4, 2002, through February 13, 2002 (the day before defendants filed additional pretrial motions, which stopped the running of the STA) as includable for purposes of the STA.

-19-

*g) Continuances granted on February 19 and July 18, 2002*

Apperson contends that the two continuances granted by the district court (the first continuance was granted on February 19, 2002; the second was granted on July 18, 2002) to Pickard based on medical problems experienced by Pickard's counsel should not have served to toll the speedy trial clock. According to Apperson, the district "court failed to consider all the necessary factors outlined in § 3161(h)(8)(B) prior to granting the continuance," and "also failed to set forth in the record its reasons for finding the ends of justice served by the granting of the motion outweighed the best interest[s] of the public and the defendant Apperson in a speedy trial." Apperson Br. at 28.

We disagree. The district court specifically found, in granting both motions to continue, that (a) the continuances would not prejudice the parties, and (b) that Pickard's need for additional time outweighed the best interests of the public and the defendants in a speedy trial. ROA, Vol. 3, Doc. 134 at 1-2; Vol. 4, Doc. 194 at 1. The district court also effectively found, in granting both motions, that the failure to grant the motions would have denied Pickard continuity of counsel or, alternatively, would have denied Pickard's appointed counsel the reasonable time necessary for effective preparation in light of his medical problems. Lastly, it is important to note that Pickard, in his two motions for continuance, stated his counsel had contacted Apperson's counsel and that Apperson's counsel did not oppose either of the proposed continuances. ROA, Vol. 3, Doc. 134 at 2 ("Counsel for the accused, Clyde Apperson, also indicates no objections to rescheduling of the jury trial."); Vol. 4, Doc. 186 at 4 ("This counsel has checked with attorney for

-20-

Apperson . . . who voiced no opposition to rescheduling to allow the surgery to be undertaken."). Consistent with those statements, Apperson filed no objections to the motions or the district court's orders granting those motions. Thus, Apperson's acquiescence in the continuances weighs in favor of a finding that the time is excludable under the STA. See United States v. Westbrook, 119 F.3d 1176, 1188 (5th Cir. 1997) (citing defendant's failure to object to continuance as a basis for finding the continuance proper and the time excludable under the STA).

*Denial of motions to suppress*

Pickard contends the district court erred in denying his motions to suppress evidence. "When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir. 2004).

*a) Illegal traffic stop*

On November 6, 2000, KHP officer Bryan Smith was advised by DEA officers that they were investigating an LSD laboratory at a decommissioned missile base near Wamego, Kansas. Smith was further advised that, based upon the results of the investigation, two men would be transporting laboratory equipment and a quantity of a precursor chemical in a Ryder rental truck and a rental car. Smith was asked by the DEA officers to assist in stopping both vehicles. When Smith and the officers assisting him

subsequently attempted to stop the rental car and truck, Pickard, who was driving the rental car, and Apperson, who was driving the rental truck, did not immediately respond to the flashing lights and siren. Accordingly, another KHP officer passed the rental car and truck and blocked their progress. Pickard responded by slowing the rental car, then fleeing as the car rolled into a ditch. Officers subsequently searched the vehicles and found the precursor chemical in the rental car and the laboratory equipment in the rental truck.

On March 12, 2001, Pickard moved to suppress evidence obtained during the November 6, 2000, traffic stop. In his motion, Pickard asserted that the authorities lacked reasonable and articulable suspicion to stop his vehicle. After conducting evidentiary hearings on the motion, the district court denied the motion in a written order issued on February 4, 2002. ROA, Vol. 2, Doc. 125. In doing so, the district court concluded the KHP officers "had probable cause to believe that defendants were transporting an LSD laboratory and chemicals used in the manufacture of LSD." Id. at 2. More specifically, the district court concluded that there was probable cause based upon "information . . . gathered by surveillance by investigative officers and from the statements" of Skinner. Id. at 3.

On appeal, Pickard challenges the district court's conclusion that there was probable cause to stop the vehicles. First, Pickard asserts that "no traffic offense was committed" prior to the stop. Pickard Br. at 31. Second, and relatedly, Pickard contends that KHP officer Smith testified at the suppression hearing that DEA officers instructed him to find a traffic infraction in order to stop the vehicles and then to "go through an

interdiction stop with consent to search." Id. According to Pickard, this suggests that the DEA officers did not believe they had a basis for stopping the vehicles absent a traffic violation.

We reject Pickard's challenge to the stop. Notably, Pickard does not challenge the district court's findings that (a) DEA agents surveilling the missile silo observed the lab equipment being loaded into the rental truck, and (b) DEA agents "listen[ed] to defendants tell [Skinner] that they were going to take the LSD lab away from the missile silo and that they urgently wanted [Skinner] to give them the precursor chemical as well." ROA, Vol. 2, Doc. 125 at 3. Moreover, the evidence presented by the government at the suppression hearing clearly refutes Pickard's suggestion that KHP officer Smith thought he was supposed to look for a traffic violation before stopping the vehicles. ROA, Vol. 13 at 19. Specifically, Smith testified that he was directed by the DEA to stop the vehicles because defendants were suspected of committing "the felony crimes of . . . attempted production or manufacture of LSD or possession of an LSD lab and [because] the key ingredients to produce the LSD were in those vehicles." Id. Thus, it is irrelevant whether or not the officers involved in the stop observed Pickard or Apperson commit a traffic violation.

*b) Search warrant*

On October 27, 2000, Skinner gave DEA agents a tour of the Wamego site, including "the missile base, . . . the storage facilities on the base, the Quonset hut, and [a] large storage shed." ROA, Vol. 13 at 103-04. During the tour, Skinner showed DEA agent Karl Nichols an aluminum can with a clear lid that contained what appeared to be

ergotamine tartrate, a chemical used for making LSD. After the tour, DEA agent Nichols sought and was granted a search warrant for the site. The warrant was executed on October 31, 2000, and DEA agents seized various items including (a) "a boxed LSD laboratory contained in approximately 40 or 45 . . . military containers," id. at 122, and (b) canisters of what was later determined to be ergocristine, a chemical similar to ergotamine tartrate that can be used to manufacture LSD.[4]

On March 12, 2001, Pickard moved to suppress evidence seized during the October 31, 2000 search. On September 10, 2001, Pickard filed a memorandum of supplemental points in support of his motion to suppress. Id., Vol. 2, Doc. 113. In the two pleadings, Pickard asserted a number of challenges to the validity of the search, including various challenges to the sufficiency of the affidavit in support of the search warrant. The district court, after conducting a series of evidentiary hearings, issued a memorandum and order on March 27, 2002, denying Pickard's motion. Id., Vol. 3, Doc. 143. In its order, the district court concluded that (1) Skinner had authority to consent and did in fact consent to the search of the site (thus obviating the need for a search warrant), (2) neither Pickard nor Apperson had a reasonable expectation of privacy in the site, (3) the affidavit submitted in support of the search warrant provided probable cause to believe there was evidence of an LSD laboratory and related materials at the site and thus to support the issuance of a search warrant, (4) there was no intentional or reckless omission of material information

---

[4] The market value of the ergocristine was estimated by DEA agent Nichols to be approximately $650,000.00.

from the affidavit in support of the search warrant, and (5) the warrant was particular enough to support the search of the missile site.

On appeal, Pickard makes several conclusory arguments. First, he contends that Skinner lacked authority to consent to the search because the purported owner of the site, Graham Kendall, was falsely informed that agents were buyers for the government. Second, Pickard contends that he personally had authority over the site because he had been granted power of attorney by the owner. Third, Pickard contends that the trust documents purportedly granting Skinner authority over the site were incomplete. Fourth, Pickard contends that because the trust documents for the property were incomplete and the DEA agents were unable to contact Skinner's attorney, the "agents did not have [a] reasonable belief [that] Skinner had authority to allow them onto the property." Pickard Br. at 33. Fifth, Pickard contends that he "had unlimited power of attorney [over the trust] and his consent was necessary before agents entered the property." Id. at 35.

We conclude Pickard's arguments are insufficient to overcome the evidence presented by the government during the hearings on the motions to suppress. During those hearings, DEA agent Nichols testified in detail regarding the ownership scheme for the Wamego missile site. Nichols testified that, prior to the consensual tour of the site, the DEA obtained from Skinner "trust documents" which they reviewed and then passed on to two federal prosecutors for review. ROA, Vol. 13 at 98. The documents indicated "that the Wamego Land Trust owned the property and that Graham Kendall was the trustee of the property." Id. at 99. Accordingly, the DEA "obtained a letter from . . . Kendall

authorizing [them] and/or . . . Skinner to be on the property and to allow anyone [they] so desired to be on the property." Id. The DEA also contacted Skinner's attorney to check on the trust documents, as well as an attorney employed by the insurance company who reviewed the title documents. The latter attorney advised the DEA that "the trustees were the owners of the property." Id. Skinner subsequently advised the DEA that he had established the Wamego Land Trust because he had an outstanding judgment against him personally and did not want a lien placed against the property if he purchased it in his own name. Id. at 100. Skinner further advised the DEA that he established Graham Kendall as the trustee for the property. Id. at 101. Lastly, Skinner advised the DEA that he established the trust for his own benefit. Id. at 102. In short, Skinner's subsequent statements indicated that Kendall "was basically a straw man for . . . Skinner." ROA, Vol. 14 at 211 (testimony of DEA agent Nichols).

Based upon this evidence[5], the district court reasonably concluded that Skinner had control over the site sufficient to afford him authority to consent to DEA agents touring the site. Likewise, the district court reasonably concluded that Pickard and Apperson lacked a reasonable expectation of privacy in the site. More specifically, there was no evidence that either defendant had an ownership interest in the site, nor was there evidence suggesting that either defendant stayed at the site or otherwise had some type of

---

[5] It is also worth noting that, during the tour, DEA agent Nichols observed that (a) Skinner maintained various personal items, including clothing, at the site, (b) Skinner "appeared [to be] living at the base," and (c) Skinner had keys and "unlimited access to all of the structures on the property." ROA, Vol. 13 at 104.

possessory interest in the site. Cf. United States v. Rhiger, 315 F.3d 1283, 1287 (10th Cir. 2003) (concluding that social guest had a reasonable expectation of privacy in his host's home). Although it is true that in June of 2000, Skinner "made an arrangement for . . . Pickard to have power of attorney of the Wamego Land Trust" "in case something happened to . . . Skinner," there was otherwise no evidence that Pickard had an ownership or possessory interest in the site at the time the search warrant was sought and issued. ROA, Vol. 14, at 212. Indeed, the evidence indicates that it was not until November 4, 2000, after the search warrant was issued, and after Pickard arrived in Kansas from California, that Skinner gave a set of keys to Pickard (and those keys were only to a portion of the site). Id. at 212-13.

*c) Interception of nonverbal communications by closed circuit television cameras*

In addition to seeking and obtaining a search warrant for the missile site, DEA agent Nichols also sought and obtained on November 2, 2000, a search warrant allowing the DEA to conduct video surveillance, by way of a closed circuit television camera, of defendants Pickard and Apperson inside the missile site. Following his indictment, Pickard moved to suppress evidence obtained via this search warrant. In support of his motion, Pickard argued that "[i]llegally obtained information was used in support of probable cause within the [a]ffidavit of . . . Nichols," and that the affidavit "contain[ed] omissions of material information which negate[d] both probable cause and the necessity requirement for issuance of" the warrant. ROA, Doc. 73 at 4.

The district court, after conducting a series of evidentiary hearings, denied Pickard's motion. Id., Doc. 143. In doing so, the district court concluded, as it had in addressing the search of the missile site, that Pickard did not have a protectable privacy interest in the missile site, and thus no Fourth Amendment violation resulted from the video surveillance. In an alternative holding, the district court concluded that probable cause for issuance of the warrant existed because "[t]he information from Skinner clearly indicated that defendants had conspired with Skinner to possess an LSD laboratory with the intention of making LSD," and "[t]his information was corroborated by the tour of the missile silo and the intercepted [telephone] conversations between Skinner and Pickard." Id. at 21. The district court further concluded that the warrant was worded in such a manner as to provide officers with a particularized description of the property and persons to be monitored, to minimize the recording of activities not related to the crimes under investigation, and to limit the time for such surveillance (i.e., no longer than thirty days or the achievement of the objectives of the investigation, whichever was earlier). Id. at 21-22. Finally, the district court concluded that "there was an adequate showing that alternative investigative techniques [had been] exhausted . . . or reasonably appeared unlikely to succeed." Id. at 22.

On appeal, Pickard complains "[t]here [wa]s no reason stated [in the affidavit] as to what led investigators to Skinner, how the investigation came about, or when Skinner was granted immunity or began cooperating." Pickard Br. at 39. Pickard further complains that the affidavit failed to inform the magistrate judge who issued the warrant that

"Skinner was wired by the government on different occasions during meetings with [Pickard], an alternative likely to be effective given past successful use." Id.

The initial problem with these arguments is that they overlook the district court's conclusion that Pickard lacked a privacy interest in the missile site, and thus lacked standing to challenge the video "search" of the site. See generally United States v. Arango, 912 F.2d 441, 445 (10th Cir.1990) (holding that, in order to have standing, person asserting Fourth Amendment rights must have personal, subjective expectation of privacy in the subject of the search that society would recognize as objectively reasonable). Even ignoring Pickard's failure to challenge the district court's conclusion regarding standing, his arguments lack merit. We have held there are five requirements that must be satisfied before video surveillance will be permitted. See United States v. Mesa-Rincon, 911 F.2d 1433, 1436 (10th Cir. 1990). "An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime; (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment; (3) the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation; (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous; and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days." Id.

After reviewing the record on appeal, we conclude that the two requirements specifically challenged by Pickard, i.e., probable cause and necessity, were met. With respect to the issue of probable cause, the district court concluded that "[t]he information from Skinner clearly indicated that defendants had conspired with Skinner to possess an LSD laboratory with the intention of making LSD," and that this information "was corroborated by the tour of the missile silo and . . . intercepted [phone] conversations between Skinner and Pickard." ROA, Doc. 143 at 21. This conclusion was amply supported by the evidence presented during the suppression hearings. As for the necessity requirement, DEA agent Nichols testified that other "real-time" surveillance techniques, such as having an informant wear a "wire," could not be used in the missile site due to the thickness of the concrete walls.[6] ROA, Vol. 14 at 192. Nichols further testified that, although they tape-recorded conversations inside the site between Skinner and the defendants, there was no guarantee that the tape recorder would work each time. Id. at 193. Lastly, Nichols indicated that, without some type of real-time surveillance, Skinner's safety was compromised when he was in the presence of defendants inside the site. Id. at 198-99. In light of this testimony, the necessity requirement was adequately established.

*Allowance of second superseding indictment*

The first indictment returned in this case alleged that defendants conspired from on or about November 3, 2000, to on or about November 6, 2000, to manufacture, distribute

---

[6] Because the thickness of the concrete walls of the missile silo prevented transmission of audio signals, the DEA had to settle for video-only surveillance of the interior of the site, combined with audio recordings made by Skinner.

and dispense ten grams or more of a mixture or substance containing a detectable amount of LSD. On January 17, 2001, a different grand jury returned a superseding indictment which retained the original count and added a second count alleging that on November 6, 2000, defendants knowingly possessed with intent to distribute and dispense ten grams or more of a mixture or substance containing a detectable amount of LSD. Finally, on June 20, 2001, the grand jury that issued the superseding indictment issued a second superseding indictment expanding the time period of the alleged conspiracy (to August 1999 through November 6, 2000) and adding an alias for each defendant. Defendants moved to dismiss the second superseding indictment on the basis of alleged grand jury abuse. The district court denied that motion.

In their respective appeals, Apperson and Pickard contend the district court erred in allowing the filing of the second superseding indictment because that indictment merely "expanded the time of the alleged conspiracy," rather than "add[ing] any new charges . . . ." Pickard Br. at 16. In their view, the primary purpose of the second superseding indictment was simply to strengthen the government's case against defendants. In sum, defendants effectively argue that the second superseding indictment should have been dismissed as a result of grand jury abuse on the part of the government.

"[T]he grand jury process is abused when the prosecutor uses it 'for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery, although this may be an incidental benefit.'" United States v. Jenkins, 904 F.2d 549, 559 (10th Cir. 1990) (quoting United States v. Gibbons, 607 F.2d 1320, 1328

(10th Cir. 1979)).  We review the district court's factual determinations on this issue

"under the deferential clearly erroneous standard."  United States v. Brown, 943 F.2d

1246, 1257 (10th Cir. 1991).  Further, the trial court's ruling on the motion to dismiss the

superseding indictment "will only be reversed if we find errors in the indictment which

prejudiced the defendant."[7]  Id.  "Such prejudice occurs 'if there is some significant

infringement on the grand jury's ability to exercise independent judgment.'"  Id. (quoting

United States v. Pino, 708 F.2d 523, 530 (10th Cir. 1983)).

In rejecting defendants' motion to dismiss the second superseding indictment, the

district court in this case made the following relevant findings:

> The court has examined the grand jury transcripts in this case.  We cannot
> find any evidence of abuse of the grand jury system.  The grand jury
> proceedings leading to the second superseding indictment were not an effort
> to discover new information and thus strengthen the government's case.  The
> information had been known by the government since the first grand jury.  It
> was not an effort to freeze the testimony of a hostile or tentative witness.  No
> such witness testified in the grand jury proceedings.  The changes made in
> the second superseding indictment changed the operative date of the
> conspiracy and added two aliases.  We believe these kinds of changes are not
> the type of impermissible strengthening of a prosecution's case that is
> considered an abuse of the grand jury system.  * * *

---

[7] Some circuits "have crafted an intermediate standard of review for evaluating
district court orders accepting or rejecting claims of grand jury abuse."  United States v.
Flemmi, 245 F.3d 24, 27 (1st Cir. 2001).  "Under that standard," such courts "accord
respect to the lower court's findings, but scrutinize them somewhat less deferentially than
[they] would be either the traditional 'abuse of discretion' or 'clearly erroneous' rubric
applied."  Id.  "This intermediate level of appellate scrutiny is akin to what [such courts]
have in other contexts termed 'independent review.'"  Id. at 28.  We, however, have never
adopted such a standard.  Even if we were to adopt and apply such a standard in this case,
the result would be the same.

The court cannot fathom how the defendants are placed at an unfair disadvantage because of the second superseding indictment or the grand jury testimony which led to it. Generally prejudice of some kind must be shown to warrant the dismissal of an indictment. * * *

ROA, Vol. 2, Doc. 126 at 2-3.

Defendants' conclusory arguments on appeal are clearly insufficient to undermine the district court's findings and conclusions. Notably, neither defendant points to a single portion of the grand jury transcripts that would call into question the district court's findings. Nor do they explain how the second superseding indictment impermissibly strengthened the government's case against them. Thus, we reject their challenges to the second superseding indictment.

*Denial of motion to sever*

Apperson contends the district court erred in denying his motion to sever his trial from that of co-defendant Pickard. We review for abuse of discretion a district court's denial of a motion to sever. United States v. Sarracino, 340 F.3d 1148, 1165 (10th Cir. 2004). "A severance should be granted when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Id. (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)).

As previously noted, the district court waited to rule on Apperson's motion to sever until it had conducted a James hearing to determine the admissibility of co-conspirators' statements. After doing so, the district court considered and rejected the specific grounds alleged by Apperson in support of his motion. First, the district court noted that Apperson

sought a severance "on the grounds that it [wa]s necessary to obtain the benefit of exculpatory testimony from his codefendant." ROA, Vol. 3, Doc. 135 at 1. Although the district court found "there [wa]s a probability that . . . Pickard would testify in the trial of . . . Apperson if a severance was granted," id. at 2, the court questioned whether Pickard's testimony, if believed by a jury, would establish Apperson's innocence. Id. at 3. Indeed, the district court concluded it was "quite plausible that both defendants were aware of the purpose of the trip [to the Wamego missile base] without explicitly discussing its illegality or using the term 'LSD.'" Id. The district court also noted there was other evidence, including taped conversations with Skinner, suggesting that both Pickard and Apperson knew the purpose of the trip was to obtain lab equipment and chemicals used for making LSD. Id. In short, the district court concluded that "[t]he significance of Pickard's potential testimony, its exculpatory nature and the extent of prejudice to . . . Apperson if the testimony [wa]s not available, [we]re severely limited by the likelihood that the testimony would be impeached or contradicted by the more persuasive evidence of the[] [taped] conversations [with Skinner]." Id. at 4. The court also expressed concern that if a severance were granted, "there would be much more time and money expended in the litigation of th[e] case." Id. The district court rejected Apperson's contention that "there m[ight] be a Bruton problem which justifie[d] severance." Id. According to the district court, it was "unaware of any incriminating statement by . . . Pickard which so directly link[ed] . . . Apperson to the crimes charged in th[e] case that a Bruton issue [wa]s raised." Id. Finally, the district court rejected Apperson's assertion "that severance [wa]s needed

because of the imbalance of evidence against the two defendants." Id. at 5. Although the district court acknowledged there was a "difference in the criminal histories of the two defendants," it concluded there was not "an extreme disparity in the evidence to be introduced against the two defendants" at trial. Id.

Although Apperson now asserts there were several factors that weighed in favor of severance, we disagree. First, Apperson asserts "there was clearly a gross disparity in the evidence against Pickard as compared to Apperson." Apperson Br. at 38. Notably, however, the district court specifically rejected this assertion: "[T]he evidence adduced at trial did not establish an extreme disparity in the evidence. The evidence showed significant involvement by Apperson in the conspiracy." ROA, Doc. 360 at 67. Our review of the record on appeal supports the district court's finding on this point. Second, Apperson contends "that Pickard's defense was antagonistic to Apperson's . . . ." Apperson Br. at 41. There is no indication, however, that Apperson ever asserted this argument below, and thus it is considered waived for purposes of appeal. Third, Apperson contends a severance should have been granted because "Pickard had a long criminal record and Apperson had no previous criminal record at all." Id. at 42. Notably, the district court specifically considered this factor and rejected it as a basis for severance. ROA, Doc. 135 at 5. Fourth, Apperson contends "the hostile exchanges between the trial court and Pickard's counsel clearly prejudiced Apperson's right to a fair trial." Apperson Br. at 42. The district court specifically considered and rejected this argument: "[T]he court does not believe that the comments made [by it to Pickard's counsel] during the trial

-35-

were improper. Moreover, the court does not find, even if some of the comments were improper, that Apperson was prejudiced by them." ROA, Doc. 360 at 68. As outlined below in the discussion of the defendants' claim of judicial misconduct, we agree with these conclusions.

In sum, we conclude that Apperson failed to establish that a joint trial would compromise any of his specific trial rights or prevent the jury from making a reliable judgment about his guilt or innocence. Accordingly, we conclude there was no abuse of discretion on the part of the district court in denying his motion to sever.

*Denial of discovery requests*

Pickard contends that the district court erred in denying various discovery requests propounded by himself and Apperson. "We review the denial of a motion for discovery in a criminal case for abuse of discretion." See United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002).

Pickard first refers to the "[d]efendants['] motion for discovery of 404(b) evidence" and the district court's denial of that motion on January 29, 2001. Pickard Br. at 44. A review of the district court's order indicates that the district court denied the motion because "[t]he government ha[d] already given adequate notice of this evidence to defendants," and required the government to provide "additional notice" "if new 404(b) evidence [wa]s developed . . . ." ROA, Doc. 63 at 5. Notably, Pickard does not indicate what aspect, if any, of the district court's ruling he is seeking to challenge on appeal. In

any event, a review of the district court's ruling persuades us there was no abuse of discretion on the part of the district court.

Pickard next makes reference to a handful of motions he filed early in the case, including a motion for disclosure of exculpatory materials, a motion for discovery, a motion to discover promises made to witnesses, and a motion to make discovery available by photocopying. Pickard Br. at 44-45. He does not, however, explain how the district court ruled on those motions, cite to where in the record the district court ruled on those motions, or explain how the district court's rulings on those motions were erroneous. Thus, he has failed to develop this issue in a sufficient manner to invoke appellate review. See Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994).

Pickard next refers to a "joint motion for production . . . requesting copies of agreements entered into between the U.S. Department of Justice and its representatives including: Haley, Skinner, Bauer, Halpern, Salvenelli and Kliphuis." Pickard Br. at 45. He does not indicate, however, how the district court ruled on this motion, nor has he included in the record on appeal a copy of the motion or the district court's ruling on it. Again, he has failed to sufficiently develop this issue to invoke appellate review. Id.

Finally, Pickard makes reference to a variety of allegedly exculpatory evidence that the government purportedly failed to disclose prior to trial. Included among this evidence is (a) a videotape taken by government agents of the Wamego missile base, (b) evidence that Skinner was "caught by Dr. Zigrant, at an early age synthesizing drugs," Pickard Br. at 45, (c) "reports regarding Skinner transferring glassware to Salvenelli similar to what

-37-

was found October 31, 2000," id., (d) evidence of threats made by the government against Skinner, (e) two affidavits from witnesses regarding what happened in a Pottawatomie County (Kansas) murder case filed against Skinner, (f) information that Skinner had acted as a confidential informant on fifteen previous occasions, (g) evidence that "Skinner spent $250,000 of his own money investigating hallucinogenic properties," id. at 47, and (h) information concerning the Wamego Land Trust provided by Skinner to the DEA.

Although Pickard does not explain where or when these matters were brought to the attention of the district court, a review of the record on appeal indicates that, during trial, Pickard moved to dismiss the indictment "based upon outrageous government conduct and prosecutorial misconduct . . . ." ROA, Vol. 5, Doc. 322 at 1. Pickard's motion alleged, in pertinent part, that the government withheld and or delayed discovery of exculpatory evidence. The district court conducted a post-trial evidentiary hearing on, and subsequently denied, the motion. In doing so, the district court noted that the "motion [wa]s woefully lacking in any details." Id. at 3. The district court further stated:

> The defendant has contended throughout that certain evidence has not been provided to him by the government or has not been provided in a timely manner. The court has found no support for this position. It appears to the court that the government has made all the evidence required by Fed. R. Crim. P. 16, Brady and Giglio available to the defendants. The court is unaware of any material that has been intentionally withheld from the defendants.

Id. at 3-4.

To the extent Pickard is challenging the district court's ruling on this motion, there is no basis for concluding the district court erred. Similar to the motion itself, Pickard's

appellate brief is "woefully lacking in any details," and Pickard has failed to specifically challenge any part of the district court's ruling.

*Denial of CIPA-related pretrial conference, continuance and discovery*

Pickard contends the district court erred in refusing his requests for a pretrial conference pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3 §§ 1 et seq.[8], a continuance of the trial to allow for production of CIPA-related information, and production of classified information. To the extent these issues involve interpretation of the CIPA, we review them de novo. O'Hara, 301 F.3d at 568. Otherwise, we review for abuse of discretion a district court's rulings applying the CIPA to discovery and trial. See id. at 569.

On July 8, 2002, Pickard filed a motion requesting a pretrial conference pursuant to the CIPA, and a continuance of the scheduled July 22, 2002 trial date. In that motion, Pickard's counsel asserted that Pickard had rejected plea proposals offered by the government, and was instead interested in proceeding to trial with a defense based in part on his alleged involvement in "Operation Infrared, a plan by the United States Department of Customs to target Afghanistan General Abdul Rashid Dostum who had been heavily involved in heroin trafficking for a number of years." ROA, Vol. 4, Doc. 231 at 2. The motion further asserted that at the requested pretrial conference, "the Court w[ould] be

---

[8] Generally speaking, the CIPA sets forth a framework for dealing with classified information at federal criminal trials. By its plain terms, it "evidence[s] Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial." United States v. O'Hara, 301 F.3d 563, 568 (7th Cir. 2002).

requested to consider any and all matters relating to classified information which would promote a fair and expeditious trial." ROA, Vol. 3, Doc. 165, at 2-3. On July 10, 2002, Pickard filed a similar pro se motion, followed on July 12, 2002, by a pro se memorandum concerning the implementation of the CIPA.

On November 8, 2002, the district court held a hearing on Pickard's request for a pretrial conference pursuant to the CIPA.[9] Id., Doc. 212 at 2. "During the hearing, [Pickard] testified concerning his [alleged] need for classified documents in this case." Id. "He recounted his past history with various governmental agencies and suggested that his defense in this case would be his belief that he was either engaging in drug policy research or conducting an undercover operation with the plan to ultimately expose the activities of . . . Skinner at the missile silo." Id. "He suggested that he had the apparent authority to engage in such undercover activities because he had previously assisted or attempted to assist government agencies in several drug operations." Id. at 2-3.

On November 26, 2002, the district court issued a memorandum and order denying Pickard's requests for classified information. ROA, Vol. 4, Doc. 217.[10] In doing so, the

_____

[9] On July 16, 2002, Pickard filed a "supplemental motion to continue" asserting that his counsel needed to have surgery performed and asking that the trial, scheduled for July 22, 2002, be continued. The district court granted that motion the same day it was filed, and continued the trial until January 13, 2003. The granting of that motion effectively rendered moot Pickard's motion for a CIPA-related continuance.

[10] Curiously, Pickard has included in the record on appeal only a partial copy of the district court's memorandum and order (the copy includes only pages 1, 17, 18, and 21 of the memorandum and order). Missing from that copy is the district court's discussion of Pickard's request for classified information and its reasons for denying the request. Our understanding of the district court's ruling is therefore taken from a subsequent

district court "noted that Pickard had never sought any of this information prior to the hearing on November 8, 2002." ROA, Vol. 4, Doc. 231, at 3. In turn, the district court concluded that "Pickard's sudden desire to seek discovery on these issues c[ould not] be allowed." Id. In other words, the district court concluded that "[a]ll of these matters [involved] information that could have been, and should have been, sought much earlier in the case." Id.

On December 17, 2002, the district court conducted a pretrial conference pursuant to the CIPA. Immediately prior to the conference, Pickard filed a supplemental motion for discovery requesting additional information concerning Operation Infrared, as well as information regarding fentanyl manufacturing. "At the [actual] conference, Pickard indicated that he intended to present" at trial various classified materials concerning Operation Infrared. Id. at 2. "The materials consisted primarily, if not entirely, of documents that Pickard had sent to various governmental agencies proposing his assistance in this operation." Id. "In response to Pickard's" proffer, "the government stated that it had no information that any of these materials [we]re classified." Id. "Accordingly, in light of the government's position, the [district] court f[ound] it unnecessary to preclude any of the evidence sought to be introduced by Pickard." Id. As for Pickard's supplemental request for discovery of classified information, the district court again refused to grant the request. Id. As in its memorandum and order of November 26, 2002, the district court concluded that Pickard's request was untimely. Id.

---

memorandum and order issued by the district court.

The district court also criticized one particular aspect of Pickard's supplemental discovery request:

> In the motion [Pickard] states that he sent a set of documents to some 32 governmental agencies concerning Operation Infrared in early 2002. He wants the government to contact each of those agencies as a result of his mailings. The court finds this request preposterous. The court is at a loss as to how some mailings made by Pickard some fifteen months after the alleged incident that forms the basis of the charges in the indictment are relevant here. The court has been lenient in allowing Pickard to proceed with his designated defenses, but this approach appears to go beyond even what the court anticipated.

Id. at 3-4.

To the extent Pickard now argues the district court erred in denying his request for a CIPA-related pretrial conference, that argument is clearly misplaced. As noted above, the district court in fact conducted a CIPA-related pretrial conference on December 17, 2002. Pickard's argument that the district court erred in denying his request for a CIPA-related continuance is also meritless. As discussed above, Pickard's request for a continuance was rendered moot by the district court's grant of his motion to continue the trial based on his counsel's medical problems. Finally, to the extent Pickard contends the district court erred in denying his supplemental discovery requests for classified information regarding Operation Infrared and fentanyl manufacturing, he has failed to rebut the district court's conclusion that his request for such information was untimely, or explain the relevance of the information to his defense.

*Grant of government's motion in limine regarding Skinner*

Pickard contends the district court erred in granting, in part, the government's motion in limine regarding the admission of evidence concerning Skinner's "prior convictions, writing of counterfeit checks, overdose, bankruptcy, grant of immunity in the matter, theft of stereo speakers, fraud securities violations, bizarre public behavior, deception of law enforcement, violation of New Jersey wiretapping statute, and deception of ownership of" the missile base. Pickard Br. at 85-86. We review for abuse of discretion a district court's rulings regarding the admissibility of evidence, including evidence intended to impeach a witness. See United States v. Howell, 285 F.3d 1263, 1269 (10th Cir. 2002).

The government filed its motion in limine regarding Skinner on February 13, 2002. The motion listed eighteen categories of information that the government suspected would be used by defendants in an attempt to challenge Skinner's credibility at trial. Pickard, in response to the government's motion, listed seven additional categories of information that he intended to use to cross-examine Skinner about at trial.

On June 20, 2002, the district court issued a memorandum and order granting in part and denying in part the government's motion. The district court denied the government's motion to the extent it sought to preclude defendants from questioning Skinner regarding his prior conviction for possessing an Interpol Identification Badge. In the district court's view, this conviction "reflect[ed] upon [Skinner's] ability to testify truthfully," and thus was admissible under Federal Rule of Evidence 609(a)(2). ROA, Vol. 3, Doc. 155, at 5. The district court also, pursuant to Federal Rule of Evidence

608(b), denied the government's motion in limine with respect to the questioning of Skinner about (1) his alleged writing of counterfeit checks to Pickard, (2) his filing of bankruptcy in 1992 in Oklahoma and allegations of fraud related to the bankruptcy, (3) his alleged theft of stereo speakers and equipment in Pottawatomie County, Kansas, and (4) civil RICO, fraud and securities violations resulting from the alleged fact that Skinner made fraudulent representations to members of Financial Operations Group which allegedly resulted in debts of over $1.3 million. The district court granted the government's motion with respect to (1) Skinner's prior drug use, (2) a charge of manslaughter filed against Skinner in Pottawatomie County, Kansas, and subsequently dismissed, arising out of the death of an individual (Paul Kenneth Hulebak) at the missile base on or about April 29, 2001, (3) evidence of Skinner's involvement as a confidential informant in a New Jersey state drug case, (4) evidence that Skinner underwent a polygraph examination and was found not credible, and (5) prior statements from Skinner to law enforcement authorities regarding "the true amount of ergotamine tartrate," "the ownership of the" missile base, and "the ownership of a large cache of firearms and ammunition." Id. at 16.

Pickard purports to challenge the district court's ruling on all of the categories of evidence it prohibited him from using to cross-examine Skinner, but fails to offer any detailed explanation of how the district court erred. Accordingly, we conclude he has failed to sufficiently place these rulings at issue. See Am. Airlines v. Christensen, 967 F.2d 410, 415 n.8 (10th Cir. 1992) ("It is insufficient merely to state in one's brief that one

-44-

is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal."); see also Fed. R. App. P. 28(a)(4) ("The brief of the appellant shall contain . . . [a]n argument . . . . The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on.").

Even assuming, for purposes of argument, that Pickard has sufficiently raised the issues in his appellate brief, we conclude the district court did not abuse its discretion in granting portions of the government's motion in limine. First, the district court correctly concluded that evidence of Skinner's alleged prior drug use could not be used to attack Skinner's general credibility. See Jarrett v. United States, 822 F.2d 1438, 1446 (7th Cir. 1987) ("A witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial."). Second, the district court did not abuse its discretion in excluding evidence of the manslaughter charge filed against Skinner because the charge was ultimately dismissed, and there is no indication that the underlying events of the alleged crime implicated Skinner's credibility. See Fed. R. Evid. 608(b) (allowing for specific instances of conduct of a witness to be inquired into on cross-examination if they are probative of truthfulness or untruthfulness); Fed. R. Evid. 609(a) (allowing evidence of prior convictions to be used to attack credibility of witness). Third, the district court acted well within its discretion in excluding evidence of Skinner's role as a confidential informant in a 1991 New Jersey drug case. During the course of that 1991 case, the state trial court apparently questioned

Skinner's credibility and character, presumably because he agreed to act as a confidential informant only in an effort to gain favor with authorities in connection with drug charges that were pending against him. In precluding Pickard from cross-examining Skinner about this matter, the district court in this case concluded that "[t]he jury in this case [wa]s capable of making its own determination regarding Skinner's credibility," and "[t]o the extent that any discussion of the New Jersey case ha[d] any probative value," it was "outweighed by its prejudicial impact and its potential to confuse the jury and unduly waste the court's time." ROA, Doc. 155, at 13. Notably, Pickard does not specifically challenge either of these determinations in his appellate brief. Fourth, the district court acted within its discretion in excluding evidence that, during the course of his involvement in this case, Skinner took two polygraph exams and was shown to have been deceptive during one of those exams. In addressing this evidence, the district court concluded that even if the evidence was deemed reliable pursuant to a <u>Daubert</u> hearing[11], it still had the potential to be overvalued by the jury, and thus was excludable under Fed. R. Evid. 403. <u>Id.</u> at 15. This ruling is entirely consistent with our precedent. <u>See</u> <u>United States v. Call</u>, 129 F.3d 1402, 1404-05 (10th Cir. 1997) (noting that "even if polygraph evidence should satisfy Rule 702, it must still survive the rigors of Rule 403"). Further, Pickard has made no attempt on appeal to challenge the district court's Rule 403 concerns. Finally, with respect to the allegedly inconsistent statements Skinner made to authorities regarding the precursor chemical, the ownership of the missile base, and the ownership of firearms and

---

[11] <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

ammunition, the district court held only that they were inadmissible under Fed. R. Evid. 608(b). ROA, Doc. 155 at 16. Importantly, the district court left the door open for these statements to be used in other ways by Pickard (or Apperson):

> This, of course, does not mean that any reference to these [prior inconsistent] statements is precluded. The statements may be admissible in other ways . . . . Counsel for both sides should understand the difference between impeachment by contradiction and impeachment by character.

Id. In his appellate brief, Pickard simply makes the conclusory assertion that these prior statements "reflect[ed] Skinner's character." He otherwise fails to challenge the district court's conclusion that the statements were inadmissible under Rule 608(b). Nor does he explain why he could not have utilized these prior statements of Skinner's in other ways (e.g., to impeach Skinner by contradiction, as suggested by the district court).

*Judicial misconduct*

During the district court proceedings, Pickard moved for a new trial based generally on what he described as errors in the treatment of his counsel by the district court during trial, including "treat[ing] his counsel differently and/or unfairly in its rulings and comments." ROA, Vol. 5, Doc. 360, at 16. In addressing Pickard's motion, the district court first noted that "Pickard's arguments lack[ed] specificity." Id. The district court then proceeded to reject Pickard's general arguments, stating:

> The court does not believe that it engaged in any unfair or improper treatment. The court attempted to resolve every issue as fairly, as quickly and as correctly as possible. The court will readily admit that it grew impatient and frustrated as the trial of this case continued. The court was constantly looking for ways to save time. In doing so, the court made a

point to confront Pickard's counsel and attempt to move his examinations along. The court believed that his examinations were largely responsible for the ponderous nature of the trial. They were at times overly long, repetitious and irrelevant. The court's efforts, however, were always aimed at having the trial progress at an appropriate rate, and not to demonstrate favoritism of one side of the other. (citation omitted).

Even if the court did inadvertently or unintentionally treat Pickard's counsel differently, the defendant is not entitled to a new trial unless the difference in treatment undermined confidence in the verdict. (citation omitted). The court does not believe any fatal error occurred here for the aforementioned reasons. First, the evidence against the defendants was overwhelming. Second, most of the comments made by the court were made during bench conferences and not in the presence of the jury. Finally, we believe that the instructions given by the court ameliorated any possible error that occurred. The court instructed the jury during the trial and in the final instructions that any comments by the court should have no impact on any of the issues of the trial. In sum, we find no basis for relief.

Id. at 17-18.

On appeal, Pickard contends the district court erred in denying his motion for new trial. Pickard does not, however, describe what alleged misconduct he is referring to, other than to summarily assert, as he did below, that the district court made "inappropriate and prejudicial remarks" during trial. Pickard Br. at 43. Moreover, Pickard fails to quote or summarize any of the allegedly prejudicial remarks in his appellate brief, and likewise fails to cite to a single portion of the trial transcript in which such a remark was made. Thus, Pickard has failed to frame and develop this issue in a sufficient manner to invoke appellate review. E.g., Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995).

Even if we were to reach the merits of the issue, Pickard has offered no basis for overturning the district court's ruling. In particular, Pickard does not refute the district

court's finding that the remarks it made were directed at his counsel rather than Pickard himself (nor does Pickard refute the district court's finding that his counsel caused the trial to greatly exceed its originally-estimated length). This distinction is important in terms of determining whether Pickard was denied the right to a fair trial. E.g., United States v. DeLuca, 692 F.2d 1277, 1282 (9th Cir.1982) (rejecting defendants' motion for new trial where district court's comments were aimed solely at defense counsel, rather than one of the defendants). Nor does Pickard refute the fact that the district court instructed the jury during trial, and again prior to deliberations, that its comments should not have an impact on the verdict. Again, this fact is significant in terms of deciding whether Pickard's right to a fair trial was infringed. E.g., United States v. Harrison, 296 F.3d 994, 1007 (10th Cir. 2002).

In his separate appeal, Apperson also asserts a claim of judicial misconduct, arguing that "the trial court committed reversible error when it made multiple inappropriate and prejudicial comments in the presence of the jury regarding the defendants, their counsel and the evidence." Apperson Br. at 16. For the reasons already discussed, we conclude there is no merit to Apperson's argument. Although the district court did, on occasion, become short-tempered with Pickard's counsel, we conclude the district court's comments were, for the most part, "no more than efforts to keep an unruly defense counsel within bounds . . . ." Harrison, 296 F.3d at 1007. Moreover, the district court expressly instructed the jury to not consider its comments as evidence. See id. (noting that district court "twice instructed the jury that it should not infer from the court's

actions that it had any opinion concerning the issues in the case."). Thus, we conclude the district court's comments regarding Pickard's counsel were not so egregious as to warrant a new trial for Apperson.

*Evidentiary rulings*

Pickard contends the district court erred in overruling certain evidentiary objections and in not admitting certain testimony and exhibits sought to be admitted by defendants. We review for abuse of discretion a district court's evidentiary rulings. E.g., United States v. Kravchuk, 335 F.3d 1147, 1156 (10th Cir. 2003) (involving admission of Rule 404(b) evidence).

Pickard first contends the district court erred in admitting Exhibit N19, which was a transcript of a tape-recorded portion of a telephone call between himself and Skinner. According to the prosecution, "the recording device failed to record the other side [i.e., Pickard's side] of the conversation." ROA, Vol. 70 at 1873. Pickard appears to be asserting that he made various exculpatory statements during the conversation and that, because those statements were not recorded or transcribed, Exhibit N19 should not have been admitted by the district court.

We conclude there was no abuse of discretion on the part of the district court in admitting Exhibit N19. As noted by the prosecution, Pickard had an opportunity to cross-examine Skinner regarding what was said by Pickard during the conversation. Moreover, Pickard testified in his own defense and, in that regard, was able to offer his explanation of what he said to Skinner during the taped conversation.

In his second challenge, Pickard contends the district court erred when it refused to admit "various e-mails and letters from [George] Marquardt[, a Kansas resident convicted of manufacturing fentanyl,] to Pickard based on hearsay objections." Pickard Br. at 48. Although Pickard fails to provide any context for the ruling, a review of the record on appeal indicates that Pickard attempted to introduce these exhibits during his own testimony at trial. The prosecution objected, arguing that the e-mail message and letters constituted hearsay because they were being "offered to prove the truth of the matter[s] asserted." ROA, Vol. 39 at 77. The prosecution argued that it "ha[d] no idea who the genuine author" of the messages and letters was since Marquardt was in prison and was not subpoenaed to be a witness at trial. Id. at 77. The district court agreed with the prosecution, noting on the record: "there's going to have to be more proof about George Marquardt sending these and signing these" messages and letters because they "could have been written by anybody." Id. at 86. Accordingly, the district court precluded Pickard from testifying about the e-mail messages and letters in the absence of further foundation. Id. at 86-91. On appeal, Pickard has failed to offer any specific arguments as to why the district court's ruling was erroneous. In any event, a review of the record leads us to conclude that the district court's ruling was proper.

Pickard refers to eight additional evidentiary rulings in his appellate brief[12], but fails to explain how any of them were erroneous. Pickard Br. at 49-53. We therefore conclude that he has failed to adequately develop these issues to invoke appellate review.

*Presentation of repetitive evidence*

Apperson contends the district court abused its discretion "when it allowed the Government to present Government's exhibit 11," a videotape/audiotape recording of a conversation between Pickard and Skinner that occurred on October 23, 2000, "to the jury on more than one occasion." Apperson Br. at 52. "The multiple playing of this evidence," Apperson argues, "was cumulative and prejudicial since it implied to the jury that this evidence was more significant than other evidence presented only once." Id.

The district court addressed this issue in detail in denying the defendants' post-trial motions for new trial:

> The defendants contend that the court erred in allowing the government to present the same video recording, Exhibit # 11, to the jury three times. The court will admit that this issue did test the court's patience and fairness.
> The government first sought to play a videotape of a meeting between Pickard and Skinner that occurred on October 23, 2000, in Marin County, California, during the testimony of Agent Ralph Sorrell. This appeared to the court to be an inappropriate time to play the tape since Agent Sorrell did

---

[12] These rulings concerned (1) a document from Pickard to Ely regarding glassware, (2) an e-mail message "from Kleiman to Pickard referencing a phone call from Ms. Lehman," (3) testimony from Pickard regarding his relationship with an individual named Peter Louie and "the trafficking system in Afghanistan," (4) testimony from Pickard regarding his discussions with U.S. Customs officials, (5) testimony from Pickard regarding an individual named "Akbar," (6) records from a "Boston locker," (7) testimony from Pickard regarding his dealings with a government employee named "Jan Mallory," and (8) various exhibits pertaining to Deputy Minister of Defense of Afghanistan General Abdul Rashid Dostum. Pickard Br. at 49-53.

not take part in the videotaping and was not actively involved in this aspect of the case. The government did not seek to introduce it at that point. During the showing of the tape, it was obvious that it was of little value to anyone in the courtroom because the picture and sound were muddled. On the following day of trial, the government explained that the copy of the tape had not played properly on the court's video equipment. The government sought to play it again using the original videotape and a transcript. The court, over the objection of the defendants, allowed the government to play the tape again. The video on this tape was better, but the audio remained very difficult to understand.

> The government then sought to play the tape again during Skinner's testimony. This time the government wanted to play their tape on their own equipment. The court wrestled with this decision. On the one hand, the court did not want to overemphasize this piece of evidence. On the other hand, the court wanted the tape to be heard and understood by the jury. The court ultimately determined that playing the tape was the only fair procedure.

> The court continues to believe that the approach adopted during the trial was necessary to allow the jury to hear this tape. The court believes that this particular matter was mishandled by the government. Nevertheless, the court found it important that the jury hear and understand the contents of this tape. The court does not believe that the defendants were prejudiced by the court's handling of this issue.

United States v. Pickard, 278 F.Supp.2d 1217, 1235 (D. Kan. 2003).

Importantly, Apperson does not dispute the district court's description of the factual circumstances surrounding the playing and introduction of Exhibit 11. In light of those circumstances, we conclude the district court did not abuse its discretion in allowing the recording to be played more than once. See generally United States v. Pulido-Jacobo, 377 F.3d 1124, 1131-32 (10th Cir. 2004).

*Admission of handwriting identification evidence*

Apperson contends "the trial court committed reversible error in allowing" the government's primary confidential informant, Skinner, "to provide testimony identifying

-53-

Pickard's handwriting." Apperson Br. at 17. According to Apperson, "[n]o known exemplar was presented to Skinner for comparison purposes and Skinner failed to provide any foundation which would qualify him to provide an opinion identifying Pickard's handwriting." Id. We review for abuse of discretion a district court's decision to admit handwriting identification testimony. See United States v. Humphrey, 208 F.3d 1190, 1204 (10th Cir. 2000).

The district court, in denying Apperson's motion for new trial, addressed this issue:

Skinner identified several examples of Pickard's handwriting during his testimony. He indicated that, based upon his past association with Pickard, he was familiar with his handwriting.
The court allowed this testimony under Fed.R.Evid. 701 and 901(b)(2). See United States v. Scott, 270 F.3d 30, 48-9 (1st Cir. 2001), cert. denied, 535 U.S. 1007 (2002). The court found that sufficient foundation had been laid for the introduction of this testimony. The court continues to believe that an adequate foundation was laid for this testimony.

ROA, Doc. 360 at 68.

We conclude there was no abuse of discretion on the part of the district court in allowing Skinner to testify as to the source of the handwriting. Federal Rule of Evidence 901(a) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In turn, Federal Rule of Evidence 901(b) provides several "examples of authentication or identification conforming with the requirements of this rule . . . ." Included among those examples is the following: "Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation." Fed.R.Evid. 901(b)(2). Here, Skinner testified

-54-

that, based upon his long-standing association with Pickard, he was familiar with his handwriting. That testimony, standing alone, was sufficient under Rule 901 to have authenticated the subsequent handwriting examples that Skinner was asked to identify.

*Refusal to allow defense witnesses to testify*

Pickard contends the district court erred in refusing to allow him to present various witnesses who, he alleges, would have helped bolster his defense that Skinner was the person who was actually in possession of and using the LSD laboratory and precursor chemical. We review the district court's rulings for abuse of discretion. See United States v. Cooper, 375 F.3d 1041, 1045 (10th Cir. 2004) ("We will not disturb the district court's conduct of trial proceedings, including rulings on motions and objections, unless it affirmatively appears from the record the court abused its discretion.").

Pickard first contends the district court erred in refusing to allow Brandon Valerius to testify. According to Pickard, Valerius would have testified "to events he observed, and activities undertaken while he worked at the [missile] base." Pickard Br. at 55. Pickard contends that Valerius's testimony would have helped to establish that the lab equipment was present at the missile site as early as 1996. A review of the trial transcript pages cited by Pickard, however, indicates that the district court agreed to allow Valerius to testify "about the lab equipment" he allegedly observed at the missile base. ROA, Vol. 86 at 3514. Thus, it is unclear what additional testimony Pickard contends should have been admitted.

Second, Pickard contends the district court erred in refusing to allow Ryan Overton to testify. Pickard contends that Overton would have testified that (a) Skinner gave him large sums of money during 1999 and 2000, (b) "at least 10 kilograms of ET per year came into the base from 1999-2000," (c) Skinner offered him "$100,000 to assist in making LSD with th[e] lab equipment," id., and (d) the DEA refused to make a deal with him in return for information. Pickard Br. at 56. As discussed in greater detail below, Overton asserted his Fifth Amendment rights and the government refused to grant him immunity to testify in the case. Thus, the district court did not "refuse to allow" Overton to testify, but rather acted well within its discretion in refusing to require Overton to testify.

Third, Pickard contends the district court erred in refusing to allow Richard Dawson to testify. Dawson was the individual who sold the missile site to Skinner. According to Pickard, Dawson "knew [George] Marquardt," the Kansas resident who was convicted of manufacturing fentanyl. Pickard Br. at 56. According to Pickard, his main purpose in presenting the testimony of Dawson was to (a) link Skinner to Marquardt (and thus presumably support Pickard's assertion that Skinner was in possession of the remnants of Marquardt's fentanyl laboratory), and (b) "discuss[] the large sums of . . . currency" that were present at the missile base prior to 2000. Id.

A review of the trial transcript indicates that Pickard made a proffer of Dawson's testimony on Thursday, March 27, 2003, after he had put on most or all of the evidence in his own defense. Pickard noted, however, that Dawson would not be available to testify

until Monday, March 31, 2003. ROA, Vol. 86, at 3592. The district court refused to allow Dawson to testify out of concern for delaying the trial proceedings any further, and because it concluded the proffered testimony was cumulative:

> Well, the Court is not going to extend this case any further. We have been in this case now for eleven weeks. And – and then this case came originally two years ago and the Court gave us an additional year, gave you an additional year here. Because of [defense counsel's] illness, we continued that another year. So we've been in this case now for over two years. And I think the attorneys have had ample time to prepare this. You've had ample time to get your witnesses here that you wanted to bring.
> It – if there's any testimony you have suggested, that testimony has been cumulative, we've heard it time and time and time again. * * *
> And there's no excuse that I know in which if you had witnesses you wanted to present they could not be here, and I'm still not sure that any witness you have suggested that they will come and testify. All I have, I've heard what witnesses are going to testify to, and they do not appear and testify to that. So I – I feel we need to bring this case to a head, and I intend to do it.

Id. at 3597-98. Because Pickard has not challenged either of these bases for refusing to allow Dawson to testify, he has failed to establish any abuse of discretion on the part of the district court.

Fourth, Pickard contends the district court erred in refusing to allow Dr. Dennis Zigrang to testify. According to Pickard, Zigrang would have testified that Skinner learned to manufacture LSD at an early age (i.e, 14 or 15). As with witness Dawson, Pickard made his proffer of Zigrang's testimony on Thursday, March 27, 2003, and indicated that Zigrang would not be able to testify until Tuesday, April 1, 2003. ROA, Vol. 86, at 3592. Further, as with Dawson, the district court rejected Zigrang's testimony on the grounds that (a) it would have unnecessarily delayed and extended the trial

proceedings, and (b) it was cumulative. Id. at 3597-98. Again, Pickard makes no attempt to challenge either of these bases, and thus fails to establish abuse of discretion on the part of the district court.

Fifth, Pickard contends the district court erred in refusing to allow the testimony of Shana Everhart. Pickard asserts that Everhart would have testified that "there was widespread use of drugs by Skinner in August 2000, that lab equipment was brought from some location to Wamego, and [that] she was on the property in August, 2000." Pickard Br. at 57. As with proposed witnesses Overton and Zigrang, the district court refused to allow Everhart to testify because (a) she would not have been available to testify until Monday, March 31, 2003, and thus would have delayed the trial, and (b) her proposed testimony was cumulative. Because Pickard has not challenged the bases for the district court's ruling, he has in turn failed to establish abuse of discretion on the part of the district court.

Sixth, Pickard contends the district court erred in refusing to allow Krystal Cole to testify. According to Pickard, Cole, if granted full immunity, would have testified that "the DEA-6s contained incorrect information." Pickard Br. at 57. As discussed in greater detail below, there was no abuse of discretion on the part of the district court in this regard because Cole asserted her Fifth Amendment rights and the government refused to grant her immunity to testify in the case.

Seventh, Pickard contends the district court erred in refusing to admit affidavits from Skinner. Pickard fails to indicate, however, what information was contained in those

affidavits. Indeed, a review of the record on appeal indicates that Skinner refused to sign any affidavits, and Pickard never sought a definitive ruling on the admissibility of the affidavits from the district court. Thus, there is no merit to this contention.

Finally, Pickard contends the district court erred in refusing to allow Shawn Rolph, a former Wamego, Kansas, police officer, to testify. Rolph "had worked for Skinner as security at the missile base for three months in 1996." ROA, Doc. 360 at 36. According to Pickard, "Rolph was prepared to testify about LSD distribution activity by Skinner known by the DEA prior to Pickard ever having met Skinner." Pickard Br. at 58. The prosecution objected to this proposed testimony, noting that defendants had cross-examined Skinner about the matter, Skinner had "indicated that it was untrue," and thus defendants were precluded from "com[ing] back and prov[ing] this up with extrinsic evidence." ROA, Vol. 83 at 3393. The district court refused to allow Rolph to testify about the matter: "Well, I'm going to rule that this unsubstantiated allegation that never went any further cannot be offered under Rule 403. * * * You can use this witness [Rolph] for anything else that you want to, but that's going to be my ruling on that." Id. at 3397. Because Pickard has not challenged the basis of the district court's ruling on appeal, he has failed to establish any abuse of discretion.

*Refusal to grant immunity to proposed defense witnesses*

Pickard contends that the district court erred in refusing to grant immunity to Ryan Overton and Krystal Cole, both of whom he wanted to testify on his behalf. Although Pickard's arguments lack clarity, he appears to be asserting that both Overton and Cole

-59-

would have offered testimony supporting his theory that Skinner was the person in control of, and actually using, the LSD laboratory at the Wamego missile base. We review the district court's refusal to grant immunity for abuse of discretion. United States v. LaHue, 261 F.3d 993, 1014 (10th Cir. 2001).

In ruling on these matters during trial, the district court concluded it had "no inherent authority to grant a witness use immunity." ROA, Vol. 86 at 3588; see also Vol. 80, at 3103 ("The Court has no independent right to give anyone any immunity."). Rather, the district court concluded that "the power to apply for immunity [wa]s the sole prerogative of the Government, being confined to the . . . United States Attorney and his superior officers." Id., Vol. 86 at 3588. The district court then asked the prosecution whether it would be willing to grant these witnesses use immunity. Id., Vol. 86 at 3588; Vol. 80 at 3117. The prosecution responded it would not because there was "no valid reason to believe that [they] would have any truthful, helpful information to provide to either party." Id. at 3588-89; see also Vol. 80 at 3109 ("we are totally [un]aware of any exculpatory information [Cole] may have as to Mr. Apperson and Mr. Pickard"); id. at 3117 ("The government will not be providing this witness immunity, Your Honor."). Indeed, with respect to Overton, the prosecution noted that "the only link [wa]s that he dated Krystal Cole . . . during a period when Skinner was not dating her and ha[d] sour grapes." Id., Vol. 86 at 3589. In light of the prosecution's representations, the district court concluded there was no basis for finding that the prosecution's decision was "a deliberate attempt to distort the fact-finding process." Id., Vol. 86 at 3589; see also Vol.

-60-

80 at 3117. Although Pickard now contends otherwise, Pickard Br. at 61 (arguing that the "[g]overnment's failure to grant immunity was a deliberate attempt to distort the fact finding process"), he offers no factual support for that contention. In the absence of such support, there is no merit to his assertion, and in turn no basis for concluding that the district court abused its discretion in refusing to grant use immunity to Overton and Cole. Notably, in LaHue, we rejected a substantially similar argument where the "defendants provided no facts to support their claim the government engaged in a deliberate attempt to distort the fact-finding process." 261 F.3d at 1015. As we noted there, we will not, under such circumstances, "sift through th[e] case's voluminous record to find support for the [defendants'] claims . . . ." Id. (internal quotations omitted). Instead, we will "defer to the district court's rulings." Id. (internal quotations omitted).

*Refusal to continue trial to allow for additional witnesses*

Pickard contends the district court erred when, during trial, it refused to grant a continuance so that defense witnesses Richard Dawson, Dr. Dennis Zigrang, and Shana Everhart could be present to testify on his behalf. We review the denial of a motion to continue for abuse of discretion, "assigning error only if the district court's decision was 'arbitrary or unreasonable and materially prejudiced the [defendant.]'" United States v. McKneely, 69 F.3d 1067, 1076-77 (10th Cir. 1995) (quoting United States v. Rivera, 900 F.2d 1462, 1475 (10th Cir. 1990)). Pickard makes no attempt to demonstrate that the district court's ruling was arbitrary or unreasonable. Although he summarily asserts he was prejudiced by the district court's ruling, he fails to offer any support for that assertion.

Accordingly, he has offered no basis on which we could reasonably conclude that the district court abused its discretion in refusing to continue the trial.

*Refusal to submit proposed jury instructions*

Pickard contends the district court erred in refusing to instruct the jury regarding two alternative defenses. A criminal defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." United States v. Trujillo, 390 F.3d 1267, 1274 (10th Cir. 2004) (internal quotations omitted). However, "such an instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate." United States v. Alcorn, 329 F.3d 759, 767 (10th Cir. 2003). A district court's failure to give such an instruction constitutes reversible error. Trujillo, 390 F.3d at 1274.

At trial, Pickard asserted the defenses of public authority[13] and, alternatively, entrapment by estoppel. "The public authority defense requires a defendant to show that he was engaged by a government official to participate in a covert activity." United States v. Parker, 267 F.3d 839, 843 (8th Cir. 2001). "The defense of entrapment by estoppel is implicated where an agent of the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns under the Fifth and Fourteenth amendments." United States v. Hardridge, 379 F.3d 1188, 1192 (10th Cir. 2004) (quoting

_____

[13] In Pickard's opening appellate brief, the heading for this issue refers to "apparent authority." Pickard's arguments, as well as the record, however, indicate that he sought instructions on public authority, not apparent authority.

-62-

United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir. 1994)).  Thus, there must be an active misleading by a government agent, and actual reliance by the defendant which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.  Id.  Further, "the government agent must be one who is 'responsible for interpreting, administering, or enforcing the law defining the offense.'"  Id. (quoting United States v. Gutierrez-Gonzalez, 184 F.3d 1160, 1167 (10th Cir. 1999)).

To support those defenses, Pickard and his counsel relied on Pickard's background combined with what can, objectively speaking, be described as an unusual story on Pickard's part.  According to the record, Pickard has an extensive criminal background, including a prior California state conviction for manufacturing LSD.  Notwithstanding that criminal background, Pickard was able to accumulate a fairly impressive academic resume, including graduate work in chemistry at Purdue University[14] and a 1997 masters degree in public policy from the John F. Kennedy School of Government at Harvard University.  According to Pickard, both during his period of study at Harvard and afterwards, he focused his research on anticipating and controlling new major drugs of abuse and, in that context, focused on the proliferation of fentanyl laboratories in the United States and former Soviet Union.  Pickard testified that, as part of that research effort, he regularly contacted members of federal law enforcement to inform them of his

---

[14] The government alleges that, while at Purdue, Pickard studied under Dr. David Nichols, a biochemist with a DEA Schedule I license to manufacture LSD, and that Pickard obtained patents for the manufacture of LSD from Hungary, Czechoslovakia, and Germany.

findings, and that he also, at times, had contact with addicts and criminals and acquired samples of various drugs. Pickard further testified that it was within the context of this research work that he, by happenstance, came into contact with Skinner, Apperson, and the LSD laboratory ultimately seized by authorities in Kansas. According to Pickard, he was attempting to track down the remnants of a Kansas-based fentanyl laboratory operated by George Marquardt, and he ultimately concluded that those remnants had fallen into the hands of Skinner and were stored at the Wamego missile base. Only after touring the base with Skinner did he realize that the base contained LSD manufacturing equipment. Pickard alleged that he and Apperson were attempting to seize and ultimately destroy the LSD lab equipment and the precursor chemical when they were arrested by authorities on November 6, 2000.

During the instruction conference, the district court concluded it "w[ould] not allow the public authority defense offered by Defendant Pickard to be considered by the jury." ROA, Vol. 86 at 3626. In reaching this conclusion, the district court stated: "There is insufficient evidence that the Defendant [Pickard] had a reasonable belief that he was acting as an authorized agent at the time of the events surrounding the charges contained in the Indictment." Id. at 3626-27. More specifically, the district court noted there was no evidence that Pickard "acted on the request or the advice of a duly-authorized law enforcement official concerning the charges in the Indictment." Id. at 3627; see id. at 3631-32 ("Let me say again, the Court finds absolutely no evidence whatsoever of any tie-in with public authority."). The district court likewise concluded the evidence was

-64-

insufficient to support an entrapment by estoppel instruction. Id. at 3656. The district court did, however, "allow Defendant Pickard to argue that he had an innocent intent when he engaged in the conduct surrounding the charges of the Indictment," i.e., "that based upon his past activities he did not have a criminal intent with respect to any count charged in the Indictment." Id. at 3627.

The arguments contained in Pickard's appellate brief regarding these defenses are, at best, cryptic. Nowhere does Pickard outline how either of the alleged defenses applies in his case. Instead, Pickard simply refers to pieces of his own testimony and that of three defense witnesses (Roger Ely, a senior forensic chemist with the DEA; Peter Louie, a special agent with the United States Customs Service; and Robert Bonner, the former head of the DEA and the current Commissioner of the United States Customs Service). A review of the cited testimony fails to support either the public authority defense or the apparent authority defense. In particular, none of the testimony cited by Pickard establishes that Pickard was engaged by a government official to participate in covert activity, or affirmatively mislead by a government agent as to the state of the law. And, given Pickard's former conviction for manufacturing LSD, we have no trouble concluding that he was well aware of the state of the law concerning such activity. Thus, we conclude the district court did not err in refusing to instruct the jury on these defenses.[15]

---

[15] In rejecting Pickard's motions for new trial, the district court likewise noted that Pickard's own testimony was insufficient to establish the public authority defense: "He never testified that any official specifically gave him authority to possess LSD equipment or manufacture LSD. * * * The defendant . . .was unable to show that any government officials had ever authorized his illegal activity." ROA, Doc. 360 at 43.

*Limitations on time for closing arguments/refusal to postpone closing arguments*

Pickard contends the district court erred in limiting the time period available to his counsel to prepare for closing arguments, and in limiting the length of the closing arguments to an hour and a half per defendant. As previously noted, a district court has broad discretion in its conduct of the trial, including the amount of time it affords counsel to prepare for closing arguments. See Cooper, 375 F.3d at 1045 ("We will not disturb the district court's conduct of trial proceedings . . . unless it affirmatively appears from the record the court abused its discretion."). Likewise, "[a] district court has broad discretion in limiting the scope of closing arguments." United States v. Rogers, 960 F.2d 1501, 1513 (10th Cir. 1992) (internal quotations omitted). Thus, any limitations placed by a district court on closing arguments are reviewed by this court only for abuse of discretion. See id.

Although Pickard contends he was "substantially prejudiced" by the district court's refusal to give his counsel an intervening weekend to prepare for closing argument, he fails to specify what his counsel would have done differently had he been provided such additional time. Moreover, he fails to address at all the district court's stated reason for refusing to postpone closing arguments, i.e., that the jury was interested in finishing the trial. Accordingly, he has failed to establish any abuse of discretion on the part of the district court in this regard.

We further conclude there was no abuse of discretion on the part of the district court in limiting the length of the closing arguments. In particular, our review of the record leads us to conclude that the ninety minutes allotted by the district court for each

defendant was entirely reasonable given the fact that there were only two counts and two defendants at issue. E.g., United States v. Sotelo, 97 F.3d 782, 793 (5th Cir. 1996) (finding no abuse of discretion where district court limited closing argument to ten minutes for each defendant in case covering a six-year period and involving multiple conspiracies, 40 witnesses, 133 exhibits, a twelve-count indictment, and 22 pages of jury instructions was not abuse of discretion). Further, we note that Pickard has not identified what additional evidence or theories his counsel would have covered during closing had he been afforded more time. See id.

### Prosecutorial misconduct

Apperson and Pickard contend the prosecution engaged in various acts of misconduct that warrant reversal of his conviction and the grant of a new trial. "When defense counsel contemporaneously objects to" alleged prosecutorial misconduct "at trial and moves for a mistrial, we review a district court's decision to deny his motion for abuse of discretion." Kravchuk, 335 F.3d at 1153. Likewise, when prosecutorial misconduct is asserted in a motion for new trial, we review for abuse of discretion the denial of that motion. United States v. Cline, 349 F.3d 1276, 1291 (10th Cir. 2003). As for the merits of a claim of prosecutorial misconduct, we apply a two-part test. Kravchuk, 335 F.3d at 1153. "First, we decide whether the conduct was improper." Id. "Second, we decide whether the conduct, if improper, warrants reversal." Id. The general focus of the second part of the test focuses on "whether the prosecutor's conduct affected the fairness of the trial." Id. (internal quotations omitted).

-67-

*a) Alteration of exhibit*

Apperson and Pickard assert that the DEA, after seizing a laptop computer owned by Pickard, modified or deleted information contained thereon concerning Pickard's contacts with DEA agents. During trial, Pickard

> testified that a copy of an address book taken from a computer that was seized on November 6, 2000 and introduced by the government into evidence as Government Exhibit 196, was incomplete. He asserted that the address book contained references to individuals who were employed by the DEA and that these items were missing. He testified that an examination of the computer would confirm his testimony. The court undertook an examination of the contents of the computer and learned that the address book did contain the DEA references. As the court was examining the computer, the government quickly learned that the exhibit that it had introduced was incomplete. The government informed the court that the computer had been sent to the DEA for examination and the DEA references had been deleted by computer analysts at the DEA and sent to someone else for further review. The DEA computer analysts then sent a copy of the address book with the DEA references deleted to government counsel. They later sent a complete copy, but government counsel was unaware that there was any difference in the two lists of names and addresses. After learning of these circumstances, the court allowed the defendant to introduce a complete copy of the address book.

ROA, Doc. 322 at 4-5. Pickard subsequently moved to dismiss the indictment or, alternatively, for a mistrial on the basis of these incidents. The district court denied that motion, stating as follows:

> This incident is perhaps the most serious example of government misconduct because all of the others noted by the defendant either do not constitute any type of improper conduct or are so trivial as to be of little consequence. The court was concerned by this incident, but ultimately we do not believe that government counsel was involved in any wrongdoing. Moreover, the court does not see that the defendant was prejudiced by it. The problem was addressed and corrected prior to the conclusion of the defendant's testimony. The defendant was able to make whatever points were necessary from the address book. The jury was not misled in any

-68-

fashion. Accordingly, the court does not find that this incident requires either dismissal of the charges or a mistrial.

Id. at 5.

Although Apperson and Pickard purport to challenge the district court's ruling on appeal, they make no attempt to refute the district court's factual finding that "government counsel was [not] involved in any wrongdoing." Nor do they assert, let alone offer any explanation of how, this incident would have adversely impacted the jury's decision-making. Thus, we conclude there was no abuse of discretion on the part of the district court.

*b) Coaching of witnesses*

According to Pickard, Skinner informed his attorney during trial, and Skinner's attorney in turn informed counsel for Pickard and Apperson, that the prosecution requested "to know what exhibits defense [counsel] were interested in so that witnesses could be 'prepped' for cross-examination." Pickard Br. at 76. In other words, Pickard asserts, "every time defense counsel requested duplication of exhibits, the information was relayed to the prosecutor and he then pulled copies of the same, which allowed the prosecutor to then prepare the witness for questions expected to be asked" regarding those exhibits. Id. Apperson raised this issue during trial and asked for a mistrial. ROA, Vol. 28 at 1-16. The district court denied the motion. Id. at 15-16.

After reviewing the record on appeal, we conclude there is no merit to this issue. During the in-chambers conference on the issue, DEA case agent Karl Nichols directly refuted, under oath, Skinner's assertion. Likewise, the lead prosecutor in the case stated to

the district court: "Judge, at no time did I or anyone at my direction participate in programming a witness, period." Id. at 12. The lead prosecutor further stated: "It seems very likely Skinner fundamentally misunderstood what occurred, or he misperceived what had happened, and then communicated that to [his counsel], but unequivocally, I didn't participate in anything like [Apperson's counsel] has described . . . ." Id. at 15. In light of Nichols' testimony and the statements from the lead prosecutor, neither of which are seriously refuted by Pickard, we conclude the district court did not abuse its discretion in denying the request for a mistrial.

*c) Improper remarks*

Pickard contends the lead prosecutor made improper comments that "had a negative impact on the jury as to Pickard's guilt." Pickard Br. at 77. In particular, Pickard contends that at one point during trial he left his seat to view an exhibit and the lead prosecutor, apparently believing Pickard was too close to the jury box, "exclaimed, 'Get him the f**k away from the jury!" Id. Pickard also contends that the prosecutor referred to him "as a schmuck during closing." Id.

We conclude the district court did not abuse its discretion in denying Pickard's request for a mistrial or new trial based upon the first remark. Shortly after the remark was made by the lead prosecutor, Pickard's counsel alerted the district court to the remark and expressed concern that a single juror had overheard it. To resolve the issue, the district court questioned the juror in chambers. ROA, Vol. 62 at 801. The juror stated she had not heard the lead prosecutor make any remark. Id. at 802. In light of these facts, we

-70-

conclude that the lead prosecutor's remarks, though improper, did not impact the fairness of Pickard's trial.

As for the second alleged remark, a review of the record on appeal indicates that Pickard has misconstrued that remark. In denying Pickard's motion for new trial based upon this alleged remark, the district court noted that "government's counsel never suggested that the defendants were 'schmucks.'" ROA, Doc. 360 at 62 (order denying motions for new trial). "Rather, . . . he clearly stated that Pickard 'was not some public policy schmuck.'" Id. In other words, the prosecutor "was suggesting that Pickard was not as he had represented during his testimony but was in fact an experienced and successful LSD chemist." Id. at 62-63. In the district court's view, "[t]he government was [simply] commenting on the testimony of the defendant, and . . . that it was a fair comment." Id. at 63. Further, the district court concluded that, "given the extraordinary weight of evidence against the defendant, . . . the comment had little prejudicial impact, even if it was improper." Id. Importantly, Pickard fails on appeal to challenge the district court's conclusions regarding this remark.

*d) Withholding of evidence favorable to Pickard*

Finally, Pickard contends the prosecution withheld exculpatory evidence from him. For example, Pickard asserts the prosecution failed to disclose "LSD research reports" and reports of LSD activity at the Wamego missile base prior to Pickard meeting with Skinner. Pickard Br. at 74. Likewise, Pickard contends the prosecution "knowingly fail[ed] to disclose the existence of an extensive video of the alleged LSD laboratory . . . ." Pickard

Br. at 77. Pickard contends the unedited version of the video "could have been used for effective cross-examination of government witnesses as it pertained to [the] bounds of the search [at the missile base] and impeachment of government witnesses." Id. at 78.

Our review of the record persuades us there is no merit to Pickard's arguments. The record indicates that Pickard moved to dismiss the indictment based in part on his assertions that the prosecution withheld and/or delayed discovery of exculpatory evidence. ROA, Doc. 322. After conducting a post-trial evidentiary hearing on the motion, the district court denied it. In doing so, the district court "found no support" for Pickard's assertion that exculpatory evidence was withheld. Id. at 3. To the contrary, the district court concluded "that the government . . . made all the evidence required by Fed. R. Crim. P. 16, Brady and Giglio available to the defendants." Id. at 3-4. Notably, Pickard has again failed to specifically challenge any part of the district court's ruling, and thus has failed to establish that the district court abused its discretion in rejecting his assertions of prosecutorial misconduct.

*Denial of motions for judgment of acquittal*

Pickard contends the district court erred in denying his motions for judgment of acquittal. In support of his contention, Pickard asserts that "evidence and testimony indicating Skinner made LSD and provided money to Pickard establishes reasonable doubt." Pickard Br. at 83. We "review[] the sufficiency of the evidence to support a conviction or the denial of a defendant's motion for judgment of acquittal de novo." United States v. Williams, 376 F.3d 1048, 1051 (10th Cir. 2004). "In doing so, we view

-72-

the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt." Id.

After reviewing the record on appeal, we conclude, as did the district court in denying Pickard's motions, that the evidence of Pickard's guilt on both charges was overwhelming. Without recounting that evidence in detail, we note that the testimony of Skinner, combined with the substantial physical evidence, was more than ample to support the convictions. Although Pickard strenuously attacks the veracity of Skinner's testimony, the jury was clearly entitled to, and indeed did, find Skinner to be a credible witness. Moreover, as previously discussed, there was little, if any, evidence to support Pickard's own testimony, and the verdicts indicate that the jury reasonably rejected that testimony as incredible. Thus, we conclude the district court properly denied Pickard's motion for judgment of acquittal.

*Cumulative error*

Apperson and Pickard contend they are entitled to a new trial due to cumulative error. Cumulative-error analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990). "Given that no error occurred in this case, we will not reverse on grounds of cumulative error." United States v. Muessig, 427 F.3d 856, 866 (10th Cir. 2005).

*a) Pre-<u>Blakely/Booker</u> sentencing issues*

In his original opening brief, which was filed before the issuance of <u>Blakely v. Washington</u>, 124 S.Ct. 2531 (2004), and <u>United States v. Booker</u>, 125 S.Ct. 738 (2005)[16], Apperson challenged his sentence on three grounds: (1) the district court erred in refusing "to find that [he] played a minor role in the charged offense," Apperson Br. at 18; (2) the district court erred in applying a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) on the grounds that Apperson was a supervisor or organizer; and (3) the district court erred in applying a two-level enhancement for obstruction of justice. Notably, <u>Booker</u> does not alter the scope of review we apply to these challenges. <u>See</u> <u>United States v. Wolfe</u>, 435 F.3d 1289, 1295 (10th Cir. 2006). In other words, in analyzing a district court's application of the Sentencing Guidelines, we continue to review legal questions de novo and factual findings for clear error. <u>Id.</u>

We turn first to the district court's application of a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c). Generally speaking, § 3B1.1 provides for an enhancement to a defendant's base offense level if the defendant played an "aggravating role" in the offense. In particular, § 3B1.1(c) requires a sentencing court to impose a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . ." The district court in this case found that "Pickard was clearly the leader and

---

[16] Apperson was sentenced on November 25, 2003, well before the issuance of <u>Blakely</u> or <u>Booker</u>.

organizer of this conspiracy" and that Apperson "did not . . . have a status equivalent to that of Pickard." ROA, Supp. Vol. 1, Doc. 425 at 2. The district court did, however, find that Apperson "played a significant role in the LSD operation" and "provide[d] substantial assistance to Pickard . . . ." Id. Accordingly, the district court concluded that Apperson was therefore properly characterized "as a manager or supervisor under § 3B1.1(c)." Id.

We conclude the district court did not err in applying the § 3B1.1(c) enhancement. The evidence presented by the government at trial amply supported the district court's finding that Apperson played a significant role in the LSD operation and provided substantial assistance to Pickard. In particular, that evidence established that Apperson bore primary responsibility for setting up, maintaining, concealing, and dismantling the conspiracy's laboratory equipment and, in that capacity, managed a small group of "employees." Apperson also played a role in obtaining precursor chemicals and laundering money, again often through underlings. Based upon those findings, which demonstrate that Apperson exercised some degree of control over others involved in the commission of the offenses, we agree with the district court that a two-level increase was warranted pursuant to § 3B1.1(c). See United States v. Backas, 901 F.2d 1528, 1530 (10th Cir. 1990) (holding that § 3B1.1(c) is satisfied upon a showing that the defendant exercised any degree of direction or control over someone subordinate to him in the scheme).

In turn, we agree with the district court that Apperson did not play a "minor role" in the offenses and thus was not entitled to a reduction in his offense level pursuant to §

3B1.2(b). As the First Circuit noted in <u>United States v. Conley</u>, 156 F.3d 78, 85 (1st Cir. 1998), "an upward adjustment" under § 3B1.1 "is fundamentally inconsistent with according the same individual, in respect to the same offense, a downward adjustment for a minor or minimal role . . . ."

Finally, we conclude the district court did not err in imposing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. In imposing this enhancement, the district court found that at a pretrial motions hearing on January 9, 2001, Apperson filed an affidavit prepared and signed by Pickard alleging that Apperson had no knowledge of the clandestine LSD operations and had, instead, simply traveled to Kansas under the guise of moving some innocuous equipment. The district court further found that Apperson offered the affidavit as an exhibit at trial. Notably, Apperson does not refute these findings. Instead, he simply contends he was not responsible for Pickard's actions and "did not make any conscious attempt to obstruct justice." Apperson Br. at 70. We find these arguments unavailing. Instead, we agree with the government that this was clearly an effort on Apperson's part to conceal his "relevant conduct within th[e] conspiracy from the court and the jury," Govt. Br. at 231, and thus warranted the enhancement. <u>See</u> U.S.S.G. 3C1.1, comment. (n.4) (listing the "provi[sion of] materially false information to a judge or magistrate" as an example of obstructive conduct to which the guideline applies).

*b) Blakely/Booker sentencing issues*

Following the issuance of <u>Blakely</u>, Apperson filed a supplemental brief arguing that the district court violated the principles announced in <u>Blakely</u> by enhancing his sentence on the basis of the following judicially-found facts: (1) that he was responsible for the production, distribution, and/or possession of approximately 41 kilograms of LSD, (2) that he was responsible for the unlawful discharge of hazardous or toxic substances (which resulted in an enhancement pursuant to U.S.S.G. § 2D1.1(5)(A)), (3) that his role in the offense was that of a manager or supervisor, and (4) that he engaged in obstruction of justice. Following the issuance of <u>Booker</u>, Apperson filed a second supplemental brief. Similar to his first supplemental brief, Apperson argued that he was entitled to resentencing in light of <u>Booker</u> because the district court had enhanced his sentence on the basis of these judicially-found facts.

Because Apperson did not assert any Sixth Amendment challenge to the district court's findings prior to or at the time of sentencing, we review his arguments for plain error. <u>See</u> <u>United States v. Dazey</u>, 403 F.3d 1147, 1174 (10th Cir. 2005). "To establish plain error, [Apperson] must demonstrate that the district court (1) committed error, (2) that the error was plain, and (3) that the plain error affected his substantial rights." <u>Id.</u> "If all these conditions are met, a court reviewing the error may exercise discretion to correct it if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>Id.</u>

The first two prongs of the plain-error test are clearly satisfied in this case. More specifically, the district court, applying the then-mandatory Guidelines, made several factual findings by a preponderance of the evidence and then used those findings to increase Apperson's sentence beyond the maximum authorized by the facts established by the jury's verdict. See id. In light of Booker, it is "clear or obvious" that the district court erred in doing so. Id.

"The more difficult question is whether the constitutional error[s] in [Apperson's] case affect[ed] his substantial rights." Id. at 1175. "[T]here are at least two ways [Apperson] can make this showing." Id. "First, if [he] shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that [the] judge found by a preponderance of the evidence, then [he would] successfully demonstrate[] that the error[s] below affected his substantial rights." Id. "Second, [he] may show that the district court's error[s] affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range." Id. "For example, if during sentencing the district court expressed its view that [Apperson's] conduct, based on the record, did not warrant the minimum Guidelines sentence, this might well be sufficient to conclude that [Apperson] had shown that the Booker error affected [his] substantial rights." Id.

Apperson has not attempted to make either of these showings, and our own review of the record leads us to conclude that neither of these showings can be made. Given the

strength of the government's evidence, we are persuaded that a jury applying a reasonable doubt standard would have found the same material facts that the district court found by a preponderance of the evidence at the time of sentencing. As for the likelihood of the district court imposing a lesser sentence, there were no statements on the record by the district court expressing dissatisfaction with the Guidelines in general or as applied to Apperson's case. Moreover, the record can be read as suggesting that the district court believed it was already being lenient with Apperson in terms of its factual findings, particularly regarding the quantity of LSD involved in the offenses of conviction, and in terms of the sentence actually imposed. Thus, there is simply no basis for concluding that the district court would have imposed a lesser sentence had it had the discretion to do so. In sum, Apperson cannot satisfy the third prong of the plain-error test, and therefore he is not entitled to resentencing.

*Sentencing issues - Pickard*

Pickard raises a number of sentencing-related issues. For the reasons outlined below, however, we conclude those issues are all moot in light of the fact that Pickard is subject to mandatory life sentences under 21 U.S.C. § 841(b)(1)(A).

As noted, Pickard was charged with one count of conspiring to manufacture, distribute and dispense 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and one count of possession with intent to distribute and dispense ten grams or more of a mixture or substance containing a detectable amount of LSD, in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Prior to trial, the government, as required by 21 U.S.C. § 851, filed an information notifying Pickard that, upon conviction of either of the two charges against him, he would "be sentenced to increased punishment by reason of" two prior drug-related convictions, i.e., a 1978 California state conviction for attempted manufacture of MDA, and a 1992 California state conviction for manufacturing and selling LSD. ROA, Vol. 2, Doc. 111, at 1. Pickard was subsequently convicted at trial on both counts. At sentencing, Pickard acknowledged the existence of his two prior drug-related convictions. ROA, Vol. 91 at 346-47. Accordingly, although the district court calculated Pickard's offense level, criminal history, and corresponding guideline range under the Sentencing Guidelines (which suggested life sentences on both counts), the court ultimately noted that Pickard, "pursuant to 21 U.S.C. § 841(b)(1)(A)," was subject "to a mandatory term of life imprisonment on each conviction." ROA, Doc. 422 at 21.[17]

We agree with the government that, because Pickard is subject to a mandatory minimum life sentence under 21 U.S.C. § 841(b)(1)(A), all of Pickard's challenges to his sentence are moot. To begin with, the Supreme Court has consistently held, and recently reaffirmed in Booker, that a prior felony conviction is a sentencing factor and thus does not need to be pled in the indictment or be decided by a jury. See 125 S.Ct. at 756;

---

[17] The district court stated that "even if [it] ha[d] erred in the application of one or more of the [sentencing] enhancements so that the defendant's guideline range would drop to 360 months to life, [it] would still impose a sentence of life." ROA, Doc. 422 at 16.

Almendarez-Torres v. United States, 523 U.S. 224 (1998). In any event, Pickard admitted in this case the fact of his two prior drug-related convictions. That admission, combined with the jury's drug quantity findings, rendered him subject to a mandatory term of life imprisonment on each of his two counts of conviction pursuant to 21 U.S.C. § 841(b)(1)(A). In turn, any errors on the part of the district court in calculating Pickard's offense level and guideline range (e.g., the district court's drug quantity findings) were rendered meaningless. See United States v. Thomas, 398 F.3d 1058, 1063-64 (8th Cir. 2005) (concluding, under similar circumstances, that mandatory minimum life sentence did not violate the Sixth Amendment).

*Motion to remand*

While these appeals were pending, Pickard filed a motion asking us to remand his case to the district court so that it could grant him a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of alleged Brady and Giglio violations. Because the district court has never certified to us its intention to grant Pickard a new trial, we now deny Pickard's motion to remand as moot. See United States v. Cronic, 466 U.S. 648, 667 n.42 (1984) (noting that, despite the pendency of an appeal, a district court has jurisdiction to entertain a motion for new trial and "either deny the motion on the merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case.").

The judgments are AFFIRMED. Defendant Pickard's motion to remand is DENIED as moot.